UNITED STATES of America, Plaintiff-Appellee,

v.

Thomas A. WARREN, John L. Warren, Jr., Des. E. SCHICK and David DeFina, Defendants-Appellants.

No. 75–4368.

United States Court of Appeals, Fifth Circuit.

Aug. 24, 1978.

Daniel S. Pearson, Miami, Fla. (Court-Appointed), for John L. Warren.

Sky E. Smith, Miami, Fla. (Court-Appointed), for David DeFina.

Alan M. Medof, Miami, Fla. (Court-Appointed), for Des. E. Schick.

Stewart E. Parsons, Chattahoochee, Fla. (Court-Appointed), for Thomas Warren.

Jack V. Eskenazi, U. S. Atty., Jamie L. Whitten, Asst. U. S. Atty., Miami, Fla., Shirley Baccus-Lobel, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, SIMPSON, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, and FAY, Circuit Judges.*

* Judges Rubin and Vance were not members of the court at the time of the submission of this case to the court en banc.

TJOFLAT, Circuit Judge:

This case comes before the court en banc to review the substantial issue of the power of the Coast Guard to board and search American vessels on the high seas beyond the twelve-mile limit. A panel of this court held the boarding of an American shrimping vessel, the interrogation of its crew, and the search of the vessel unconstitutional. *United States v. Warren,* 550 F.2d 219 (5th Cir. 1977). We reverse.

A jury convicted the four defendants of conspiring to import marijuana into the United States, in violation of 21 U.S.C. § 963 (1976), and of transporting from the United States an amount of money in excess of $5,000 without filing the report required by 31 U.S.C. § 1101 (1970), in violation of 31 U.S.C. § 1058 (1970). Each defendant was sentenced to eighteen months imprisonment for the conspiracy to import marijuana and to six months for the monetary violation. The sentences of each defendant were to run concurrently.

The panel reversed the convictions of John Warren, Thomas Warren, and David DeFina. It affirmed the conviction of Des Schick. En banc review was granted, but only as to Thomas and John Warren. We reverse the panel's decision as to the Warrens. The panel's affirmance of Schick's conviction and its reversal of DeFina's conviction are left undisturbed.

## I. *Facts*

The substance of this case is a conspiracy to import from Colombia into the United States approximately ten tons of marijuana. The Government's chief witness was John Cruse, an unindicted coconspirator. He testified that Schick, a close friend, approached him in the early summer of 1974 and asked him to captain the shrimping vessel *Stormy Seas* to make the run. Cruse agreed, and subsequently he met with Thomas Warren at least twice (with Schick attending) to discuss the details of the venture.

A few weeks before the departure of the *Stormy Seas* for Colombia, Cruse and Schick drove to John Warren's residence in Miami and picked up a small boat belonging to John Warren. It was to have been used to unload the marijuana from the *Stormy Seas* upon return to the United States. A few days before departure, Cruse and Schick went to the Tallahassee apartment shared by Thomas Warren and DeFina, where they received from DeFina (Thomas Warren was not present) a trash compactor that was to have been used to compress the marijuana. The compactor and 300 plastic bags were placed on the *Stormy Seas*. On the eve of departure, DeFina provided a small boat that was also placed on board and was to have been used to load the marijuana in Colombia.

These preparations having been made, Cruse and Thomas Warren left Apalachicola, Florida, in the *Stormy Seas* on August 15, 1974. They sailed to Key West where they took on fuel and picked up John Warren, who was to serve as navigator. The following day they put to sea for Colombia.

In the early evening of August 19, the Coast Guard Cutter *Steadfast* sighted the *Stormy Seas* as she sailed southward between Haiti and Cuba in the Windward Passage. The *Steadfast* hailed the *Stormy Seas* and told her to prepare for boarding. At a point approximately 700 miles from the United States, the *Stormy Seas* received a party including three Coast Guard officers: Lt. Miller, who was in charge of the boarding party, Ensign Ryan, and First Class Quartermaster Tuck. Accompanying these officers were Special Agent Battell of the Drug Enforcement Agency and Agent Wallace of the Customs Service.

Lt. Miller introduced himself and the other members of the boarding party and asked to see the master of the vessel. John Cruse identified himself as the captain, and Lt. Miller asked for the ship's enrollment papers. Cruse produced the papers, and Lt. Miller noted that they did not indicate that the *Stormy Seas* was bound for a foreign port. Following customary Coast Guard procedure, Agent Battell inquired whether any firearms were aboard, and Thomas Warren stated that there were. He led

Ensign Ryan and Agents Wallace and Battell to the crew's quarters where a .22 calibre and two .38 calibre pistols were produced. When the guns were brought forth, Agent Battell asked Thomas Warren why the guns were on board, and in his reply he stated that the purpose of the cruise was to speculate in land in South America. Record, vol. 2, at 80. According to the testimony of Agent Battell, during this conversation Thomas Warren evinced some confusion. Warren asked, "What's this all about?" and remarked, "We are all in this together." *Id.* at 214.

Agent Wallace and Ensign Ryan testified that they and Agent Battell made a "cursory search" of the *Stormy Seas* immediately after the guns were produced and transferred for identification to the *Steadfast. Id.* at 61–62, 229 (Wallace); *Id.* at 44 (Ryan).[1] During this search a small amount of marijuana was discovered in Cruse's cabin. According to Agent Wallace, this discovery "aroused my suspicion somewhat," prompting him to make a more thorough, though unproductive, search of Cruse's cabin. *Id.* at 61–62.[2]

Agent Wallace testified that after he had conducted this search, he questioned Cruse as to the nature of the trip. Cruse answered that the Warrens had chartered the *Stormy Seas* for fishing and diving. *Id.* at 62. John Warren also stated that the purpose of the cruise was fishing. *Id.* at 81. Agent Wallace had noted, however, the absence of any ice in the hold that could have been used to preserve the catch. *Id.* at 62. While examining the ice hold, he did see scuba gear, which, according to Lt. Miller, "was in pretty bad shape." *Id.* at 19.

These circumstances, along with the conflicting stories of the Warrens and Cruse as to the nature of their trip, led Agent Wallace to suspect "the purpose of this trip was going to be to bring back narcotics." *Id.* at 77. He reasoned that money for purchasing the narcotics might be on board. *Id.* Therefore, he asked Cruse and the Warrens, who were gathered on the fantail, whether they had any money on board. Thomas Warren answered that he had a "couple of thousand dollars." Agent Wallace asked what he meant by that answer, and Thomas Warren replied, "maybe $5,000." Agent Wallace asked whether he had more than that; the reply was, "maybe $7,000." Agent Wallace then asked whether the money had been declared. Thomas Warren answered "no." *Id.* at 39–40, 48–49, 63–64, 81, 207, 232.

Agent Wallace asked to see the money, and Thomas Warren led him, Agent Battell, and Ensign Ryan to the crew's quarters. Warren lifted up the corner of a mattress and removed several envelopes, which he handed to Agent Wallace. While the mattress was raised, additional envelopes were exposed. Agent Wallace examined the envelopes handed him and realized that they contained more than $7,000. He advised Thomas Warren that there was a possible currency violation, and at this point Agent Battell read Warren the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Additional envelopes and cash were removed from under the mattress. Later, envelopes containing cash were discovered in a briefcase. The total recovered was $41,500 and 46,800 Colombian pesos. Thomas Warren was led back to the fantail, where John Warren and Cruse were given their *Miranda* warnings and arrested.

Agent Wallace testified that after these events, he and Cruse, who had volunteered to assist, went to the hold to conduct a

1. Agent Battell testified, however, that no search was conducted until the currency violation had been discovered and the currency recovered. Record, vol. 2, at 87.

2. Agent Wallace's testimony was corroborated by Cruse. Record, vol. 2, at 109. Ensign Ryan testified that the marijuana was found in a drawer in the galley. *Id.* at 44. At some point a small vial containing cocaine residue was also found.

We must point out that the mere possession of a controlled substance beyond the territorial limits of the United States (three miles from the coast) is not illegal. Therefore, although the small amount of marijuana "aroused [Agent Wallace's] suspicion somewhat," its possession did not constitute an offense.

search. While in the hold, Agent Wallace advised Cruse that he was "very possibly in some serious trouble with exporting money," and asked, "Are you going for a coke run?" Cruse responded that they were not going for cocaine, but for "pot." Record, vol. 2, at 237.[3]

The defendants were transferred to the *Steadfast*. Subsequently, an extensive inventory search was conducted by the Coast Guard, during which the trash compactor and plastic bags were discovered behind paneling in the aft hold. Additional evidence was found, including a letter to Thomas Warren from the Colombian consulate giving instructions for complying with Colombian customs, a legal pad of Thomas Warren listing equipment to be used to load and package the marijuana and referring to Colombian contacts, and Thomas Warren's passport showing that he had visited Colombia just two weeks before the *Stormy Seas* set sail.

## II. *The Panel Opinion*

The panel hearing the appeal in this case ruled that the warrantless search of the *Stormy Seas* violated the fourth amendment. This ruling was founded on two theories. First, the panel held that Agents Battell and Wallace were not authorized to assist the Coast Guard either in the questioning of those on board the *Stormy Seas* or in the search that ensued. The panel reasoned that any evidence adduced by the two agents was therefore unconstitutionally obtained. Second, the panel ruled that even the Coast Guard officers had no authority to extend their inquiry beyond that called for by a customary safety and documentation check. With all deference to the panel, we think that the Coast Guard had authority to stop and board the *Stormy Seas* and to question her passengers and captain and that the participation of Agents Battell and Wallace did not diminish this authority. We find the scope of the interrogation of the defendants while on board the *Stormy Seas* to be justified by the circumstances of this case.

The panel also concluded that Thomas Warren's admission to Agent Battell that he had $7,000 was obtained in violation of the fifth and sixth amendments because Warren had not been read the *Miranda* warnings prior to this admission. Moreover, it was held that because this admission had been illegally obtained, it could not support the subsequent search of the *Stormy Seas*. Our analysis leads us to the conclusion that this statement was not obtained in violation of *Miranda*. Moreover, that the warnings were not given until after Thomas Warren produced the incriminating envelopes is of no constitutional moment because *Miranda* does not apply to the production of the physical evidence in this case. Since the actions of the Coast Guard and of Agents Battell and Wallace were within their authority and because Thomas Warren's admission that he violated the reporting requirement was not gained in violation of *Miranda*, the evidence obtained from the *Stormy Seas* was properly admissible at trial.

The panel noted, but did not pass upon, the assignment of error by the Warrens that the district court improperly admitted into evidence a statement Thomas Warren made at the time of the defendants' arrest. Thomas Warren, an attorney, had stated that he wished to represent his brother John and Cruse, and he advised them to remain silent. This statement was related at trial by Agent Battell on direct examination. Record, vol. 2, at 221. The Warrens assert that this testimony was an impermissible comment on their right to remain silent. Because we reverse the panel's decision with respect to the Warrens, we reach this issue in our discussion below and find the admission of the statement not violative of the Warrens' fifth amendment rights.

John Warren asserts two additional errors upon which the panel ruled. First, he claims that the trial court improperly denied his motion for severance after Thomas Warren's statement, "We are all in this

---

**3.** Cruse testified that this conversation took place before the currency was discovered, but he was not certain as to the timing. Record, vol. 2, at 106–108.

together," was elicited at trial during the direct examination of Agent Battell. The panel held that the admission of this statement violated *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which prohibits the introduction, in a joint trial, of a codefendant's confession incriminating the defendant, when the codefendant refuses to take the stand. Since we find this statement properly admissible against John Warren as a statement by a coconspirator during and in furtherance of the conspiracy to import marijuana into the United States, *Bruton* does not bar its introduction at trial. Second, John Warren contends that the trial court violated Fed.R. Evid. 615 by allowing government witnesses to remain in the courtroom during the pretrial suppression hearing. The panel ruled that the judge erred in denying the defendants' motion to exclude the witnesses. Although we agree that the district court erred, we do not think this error so prejudicial as to require the reversal of the Warrens' convictions.

■ In our analysis below, we shall address these issues in the order presented. We note here several determinations of the panel that we believe to be sound. Both Thomas and John Warren objected to the admission of testimony by Agent Battell that defined the word "shirts," which appeared in the letter from the Colombian Counsel's office to Thomas Warren, to mean cocaine. The passage containing the word is, "don't forget to pick up my shirts from Ozzie." The Warrens complained that the testimony was inadmissible because they had not been charged with any violation concerning cocaine. The panel concluded that the admission of the testimony was "harmless in light of the weight of the other evidence," 550 F.2d at 226, and we agree. The panel also determined that a statement by the Government to the jury during rebuttal argument, "no one has given you any reasonable explanation of why John Warren and Tommy Warren were on

a shrimp boat 700 miles [at sea with the trash compactor, plastic bags, and money]," was not an impermissible comment on the defendants' right to remain silent. *Id.* at 226 n.8, 227–28. We agree with this determination as well. *See United States v. Dearden*, 546 F.2d 622, 625–26 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *United States v. Hill*, 508 F.2d 345, 347 (5th Cir.), *cert. denied*, 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 672 (1975). Finally, the panel dismissed as without merit a contention by Thomas Warren that the trial judge made certain impermissible comments during the voir dire examination of prospective jurors. 550 F.2d at 226 n.7. We concur with the panel's resolution of this issue.

### III. *Analysis*

A. *Authority for the Boarding of the Stormy Seas, the Interrogation, and the Search*

■ Federal law authorizes the Coast Guard to

make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

14 U.S.C. § 89(a) (1976). This law is constitutional, *United States v. One 43 Foot Sailing Vessel*, 538 F.2d 694 (5th Cir. 1976), and pursuant to its authority, the Coast Guard may apprehend and board any vessel of the American flag. This authority is plenary when exercised beyond the twelve-mile limit;[4] it need not be founded on any particu-

---

4. This 12-mile limit includes the territorial sea, which extends to three miles from the coast, and the contiguous zone, which extends from

three to 12 miles from the coast. The United States exercises plenary power over the territorial sea, subject to the requirement that the

larized suspicion. *United States v. Odom*, 526 F.2d 339, 341–42 (5th Cir. 1976); *United States v. One 43 Foot Sailing Vessel*, 405 F.Supp. 879, 882 (S.D.Fla.1975), *aff'd*, 538 F.2d 694 (5th Cir. 1976). The cases have recognized the power of the Coast Guard, having boarded a vessel of the American flag, to conduct documentation and safety inspections. *United States v. Hillstrom*, 533 F.2d 209, 210 (5th Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); *Odom*, 526 F.2d at 342. If, during the course of such an inspection, circumstances arise that generate probable cause to believe that a violation of United States law has occurred, the Coast Guard may conduct searches, seize evidence, and make arrests. *Odom*, 526 F.2d at 342.

■ The boarding, interrogation, and search in this case come within these principles. The Coast Guard officers and the agents boarded the *Stormy Seas* pursuant to the authority of section 89 to conduct a safety and documentation inspection and to look for obvious customs and narcotics violations. Record, vol. 2, at 74, 85–86. In the course of this inspection, the enrollment papers were examined, and they indicated that the *Stormy Seas* was destined for no foreign port. Thomas Warren, however, professed the purpose of the trip to be land investment in South America. Later, Cruse

and John Warren stated that the *Stormy Seas* was chartered for fishing and diving, but no ice to preserve catch was aboard and the diving gear was apparently inoperative. According to the testimony of Agent Wallace, these circumstances led him to suspect that the *Stormy Seas* was on a narcotics run and motivated him to inquire as to how much money was on board. This inquiry elicited the admission by Thomas Warren that he possessed approximately $7,000 and that he had not registered it upon departure from the United States. Thomas Warren's statement established an apparent violation of customs law, and a large amount of money was uncovered after he led members of the boarding party to the crew's quarters. The defendants and Cruse were arrested, after which Cruse confessed that the *Stormy Seas* was on a "pot" run. The vessel was seized, and a search uncovered evidence confirming Cruse's confession.

Each link in this chain of events, from boarding to inventory search, is legally sound. The boarding was lawful, and the scope of the interrogation was determined by well-founded suspicion. The currency was revealed after Thomas Warren admitted that he had not registered it, and the search that produced the evidence upon which the marijuana conspiracy convictions were based took place after the arrests and

passage of foreign vessels may not be interfered with unreasonably. *See* Carmichael, *At Sea with the Fourth Amendment,* 32 Miami L.Rev. 51, 56–57 (1977). The power of the United States over foreign vessels in the contiguous zone is limited to the preservation of specific interests, *e.g.,* the enforcement of customs and safety laws. *See id.* at 58.

The high seas lie seaward of the territorial sea and thus encompass the contiguous zone. Although vessels on the high seas are subject to the powers exercised over the contiguous zones and certain safety, navigation, pollution, piracy, and slave-trade regulations, no country may assert sovereignty over the high seas. *See id.;* Convention on the High Seas, Sept. 30, 1962, art. 2, 13 U.S.T. 2312, 2314, T.I.A.S. No. 5200. To maintain order on the high seas, therefore, each nation is charged with the duty of policing its own vessels. Convention on the High Seas, art. 10, 13 U.S.T. at 2316. It was in the performance of this duty, pursuant to the authority of § 89, that the Coast Guard boarded the *Stormy Seas* some 700 miles at sea.

It is imperative, in light of the background we have just given, to establish the precise context in which we decide this case. We deal with the boarding of an American vessel by the Coast Guard beyond the 12-mile limit. Therefore, this case does not involve the application of United States law in the territorial zone or in the contiguous zone, where the Coast Guard may rely upon statutory authority in addition to § 89. In particular, we distinguish those cases defining the authority of customs officers to board vessels, pursuant to 19 U.S.C. § 1581(a) (1976), within the 12-mile limit. *See, e.g., United States v. Caraballo,* 571 F.2d 975 (5th Cir. 1978); *United States v. Stanley,* 545 F.2d 661 (9th Cir. 1976), *cert. denied,* —— U.S. ——, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978). *United States v. Tilton,* 534 F.2d 1363 (9th Cir. 1976); *United States v. Caraway,* 474 F.2d 25, *vacated on other grounds,* 483 F.2d 215 (5th Cir. 1973).

after Cruse confessed that the *Stormy Seas* was on a "pot" run.[5]

Seeing the facts in this light, we think that this case is controlled by our holding in *United States v. Odom*, 526 F.2d 339 (5th Cir. 1976). In that case, the Coast Guard sighted an American vessel, the *Mar-J-May*, some 200 miles from the United States in the Yucatan Straits, between Cuba and Mexico. Apparently without prior suspicion that narcotics or customs law had been violated, the Coast Guard boarded the *Mar-J-May* to conduct a routine safety and documentation inspection. During the inspection, a Coast Guard officer noted that the fishing gear was "rusty and unused." *Id.* at 341. The officer, wishing to examine the main-beam identification number located in the hold, was told that the hold was full of ice and that it would be difficult to see the number. After some consideration, the officer decided to open the hatch, and when he did, he saw only a small quantity of ice. He entered the hold and examined the identification number, and at this time he noticed several unmarked burlap bags in the aft of the hold. The bags were inspected, and approximately 6,000 pounds of marijuana were discovered.

The court held that section 89 authorized the boarding, regardless of whether "reasonable suspicion" that the contraband was on board existed. *Id.* at 341–42. Thus, the court found it unnecessary to determine whether a Coast Guard boarding beyond the twelve-mile limit is analogous to a roving border patrol, which, as established by the Supreme Court in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), may stop vehicles when there exists a "reasonable suspicion" that a violation of law has occurred. The court determined that the events that tran-

spired before the bales of marijuana were examined "supported a finding of probable cause to search the hold of the 'Mar-J-May.'" 526 F.2d at 342. The court noted that the fishing gear appeared to have been inoperative, that the captain of the *Mar-J-May* had been reluctant to open the hold and had falsely represented the hold to be full of ice, and that an "undetermined amount of burlap sacks [were seen] in the rear of the hold." *Id.* The court concluded as follows:

> To summarize, the initial boarding and administrative inspection made by the crew of the "Valiant" was permissible under 14 U.S.C. § 89. Further search was supported by probable cause after the facts mentioned above became evident to Chief Fieck. We therefore hold that the marijuana seized from the "Mar-J-May" was properly admitted in evidence, and that the district court correctly denied the motion to suppress.

*Id.*

Although we think *Odom* is directly on point here, the defendants contend that the facts of this case distinguish it from *Odom*. First, they argue that the participation of Agents Battell and Wallace in the events that took place on the *Stormy Seas* invalidated the boarding, interrogation, and search because the Coast Guard lacked authority to delegate its powers to the agents. Second, they urge that a customs regulation required the boarding of the *Stormy Seas* to have been founded upon probable cause. We find both of these contentions unpersuasive, and we take them up in order.

### 1. *The Participation of the Agents*

The Coast Guard is expressly authorized by statute to employ officers of federal

---

**5.** The arrests for the currency violation were valid. See note 17 *infra*. The defendants do not question the validity of the inventory search that uncovered the trash compactor, the plastic bags, and the incriminating documents. They merely claim that absent Thomas Warren's admission that he had not registered the money, which they claim was elicited in violation of *Miranda*, no probable cause existed to justify the search that produced the envelopes

containing the money. Brief of Appellant John L. Warren, Jr. at 25–26; Brief of Appellant Thomas Warren at 14. Since we find the obtention of Thomas Warren's statement not contrary to *Miranda*, see Part III. B. *infra*, the search turning up the money was supported by ample probable cause. Since the inventory search is not questioned, we do not reach the issue of its propriety.

agencies in carrying out its duties. The statute, 14 U.S.C. § 141(b) (1976), provides in pertinent part, "The Coast Guard, with the consent of the head of the agency concerned, may avail itself of such officers and employees . . . of any Federal agency . . . as may be helpful in the performance of its duties." It is clear on the face of section 141(b) that Agents Battell and Wallace were authorized to assist the Coast Guard in carrying out its legitimate functions, provided that the "heads" of the Drug Enforcement Agency and Customs Service had given the required consent.

█ Although the record does not expressly indicate whether consent was given, we think it a fair inference that at least implied consent existed. Moreover, it is incumbent upon the party moving to suppress evidence to demonstrate a lack of authority for its acquisition. The defendants made no contention, either in the district court or on appeal, that consent was lacking.[6] Even if the defendants had demonstrated that Agents Battell and Wallace were not authorized by section 141(b) to assist the Coast Guard in its actions in this case, that these actions were carried out jointly is sufficient to bring the agents under the aegis of the Coast Guard. *See United States v. Bates*, 526 F.2d 966 (5th Cir. 1976). We hold, therefore, that the

participation by the agents in the boarding, interrogation, arrests, and seizures in this case does not invalidate those actions.

### 2. The Customs Regulation

█ The defendants press a more colorable argument upon us in their assertion that a regulation promulgated by the Treasury Department required the boarding party in this case to have premised its apprehension and boarding of the *Stormy Seas* upon the existence of probable cause. The regulation, 19 C.F.R. § 162.3 (1977), provides in pertinent part,

(a) *General authority.* A Customs officer, for the purpose of examining the manifest and other documents and papers and examining, inspecting and searching the vessel, may at any time go on board:

. . . .

(2) Any American vessel on the high seas, when there is probable cause to believe that such vessel is violating or has violated the laws of the United States

. . . ..

Officers of the Coast Guard are deemed customs officers, and thus apparently subject to this regulation, by two provisions of title 14 of the United States Code.[7]

The first provision is 14 U.S.C. § 89(b) (1976), which provides,

---

**6.** We feel compelled to dispel what appears to be a misapprehension in Judge Fay's dissent. The dissent terms "wrong" our statement that the defendants failed to contest the issue whether consent for cooperation with the Coast Guard was given. 578 F.2d at 1086. The record clearly indicates that the defendants never as much as adumbrated that consent was lacking. Quite to the contrary, in their en banc brief the defendants admit the following: "[U]nder 14 U.S.C. § 141(b), the Coast Guard may avail itself of officers and employees of any Federal agency as may be helpful to it in the performance of its duties . . . ." Supplemental Brief for Appellants at 16.

Of course, as we have indicated, the defendants did initially contend that the agents' presence was unauthorized. It is, however, incumbent upon the defense to show that the boarding was illegal for lack of authority, and that such illegality, if found to exist, would call for the exclusion of any evidence subsequently obtained. The defendants' broad, unspecific

denial is insufficient to shift this burden of proof to the Government. As we said in *United States v. De La Fuente*, 548 F.2d 528, 534 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977), the defense carries an "initial, unshiftable burden of alleging and proving *some* fact sufficient to make a prima facie showing of illegality. . . . [D]efendants must at least *allege* particular facts which would tend to indicate some governmental impropriety[,] and . . . general, conclusory allegations based upon mere suspicions do not entitle a defendant to have evidence suppressed." (Emphasis in original.) *See Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

**7.** Two additional provisions of the United States Code define customs officers to include officers of the Coast Guard. They are 19 U.S.C. § 1401(i) (1976) and 19 U.S.C. § 1709(b) (1976). Neither of these provisions subjects Coast Guard officers to customs regulations. See note 11 *infra* and accompanying text.

(b) The officers of the Coast Guard insofar as they are engaged, pursuant to the authority contained in this section, in enforcing any law of the United States shall:

(1) be deemed to be acting as agents of the particular executive department or independent establishment charged with the administration of the particular law; and

(2) be subject to all the rules and regulations promulgated by such department or independent establishment with respect to the enforcement of that law.

On its face, section 89(b) appears to subject Coast Guard officers to 19 C.F.R. § 162.3 when they are enforcing customs laws.[8] The defendants argue, therefore, that 19 C.F.R. § 162.3 requires the Coast Guard to have had probable cause to believe that a customs violation had occurred or was occurring on board the *Stormy Seas* before the boarding could legally have taken place.

The argument under section 89(b) fails because of section 89(c), which states,

(c) The provisions of this section are in addition to any powers conferred by law upon such officers, and not in limitation of any powers conferred by law upon such officers, or any other officers of the United States.

We think it clear that by enacting section 89(c), Congress intended to give the Coast Guard the broadest authority available under law. As we have noted, the Coast Guard is empowered under section 89(a) to seize and board vessels of the American flag on the high seas without probable cause or any other particularized suspicion. Therefore, the customs regulation cannot restrict the power of the Coast Guard in this case, at least as far as the regulation applies by virtue of section 89(b)(2).

The Warrens, however, proffer a second provision of title 14, 14 U.S.C. § 143 (1976). It provides,

Commissioned, warrant, and petty officers of the Coast Guard are deemed to be officers of the customs and when so acting shall, insofar as performance of the duties relating to customs laws are concerned, be subject to regulations issued by the Secretary of the Treasury governing officers of the customs.

They point out that section 143 contains no counterpart to section 89(c) that would mitigate the requirement of probable cause imposed by 19 C.F.R. § 162.3. Our analysis of the legislative histories of sections 143 and 89 leads us to the conclusion, however, that section 143 should not be read to impose limitations upon the powers of the Coast Guard when it boards American vessels beyond the twelve-mile limit.[9]

The original version of section 89 [10] was enacted in direct response to the Supreme Court decision in *Maul v. United States*, 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171 (1927). *See* H.R.Rep.No.2452, 74th Cong., 2d Sess. 2 (1936). In that case, the Court held that the Coast Guard had authority to seize an American vessel thirty-four miles from shore. The vessel had become subject to forfeiture because she had undertaken a foreign voyage without being duly registered. The Court found that the Coast Guard's authority derived from a statute empowering customs officers (and Coast Guard officers because they were deemed customs officers) to seize vessels that had

---

**8.** Although § 89(b) would apparently subject the Coast Guard to regulations of the Drug Enforcement Agency when the Coast Guard enforces laws charged to that agency's administration, we have found no DEA regulation comparable to 19 C.F.R. § 162.3.

**9.** The defendants contend, as they must under the language of § 143, that because one of the avowed purposes of the boarding was to look for obvious customs violations, Record, vol. 2, at 74, 85–86, the Coast Guard officers were performing duties "relating to customs laws" and were therefore subject to customs regulations. Given our holding that § 143 cannot diminish Coast Guard authority over American vessels beyond the 12-mile limit, the defendants' contention is inconsequential in this case. We intimate nothing as to the validity of the defendants' argument where § 143 might apply.

**10.** The source of § 89 is the Act of June 22, 1936, Pub.L.No.755, 49 Stat. 1820. As far as this case is concerned, it differs in no significant respect from § 89.

become subject to forfeiture "by virtue of any law respecting the revenue, as well without as within [the customs officers'] respective districts." 274 U.S. at 505, 47 S.Ct. at 737. The Court construed the statute to provide for Coast Guard seizures beyond districts designated as customs enforcement areas, that is, beyond twelve miles from the coast.

As evidenced by the committee reports, e. g., H.R.Rep.No.2452, 74th Cong., 2d Sess. 2 (1936), Congress adopted and went beyond the holding of *Maul* to provide the Coast Guard with broad jurisdiction over American vessels. The reports echoed concern expressed by Justice Brandeis in a concurring opinion to *Maul* that the holding of the case, founded as it is upon the construction of a revenue enforcement statute, might be read to require express statutory authority for Coast Guard seizures for violations of laws other than those relating to revenue. *Id.* at 2–4; *Maul*, 274 U.S. at 512–31, 47 S.Ct. at 739–46 (Brandeis, J., concurring). Congress enacted the predecessor of section 89 to ratify the broad power of the Coast Guard to seize American vessels beyond the twelve-mile limit for the violation of any applicable law of the United States. As we shall demonstrate, section 143 is based upon different considerations.

Section 143 derives from two provisions of the Anti-Smuggling Act of 1935. Both provisions, like the current section, are definitional. Section 201 of the Act, Act of Aug. 5, 1935, Pub.L.No.238, § 201, 49 Stat. 521, includes within the term "officers of the customs," any "commissioned, warrant, or petty officer of the Coast Guard." *Id.* Section 401 merely reiterates, verbatim, section 201 of the Act. 49 Stat. at 529.[11] Neither section, however, contains any language similar to that in 14 U.S.C. § 143 that subjects Coast Guard officers to customs regulations. Such language arose for the first time in section 143, which was enacted in 1949. Act of Aug. 4, 1949, Pub.L.No.207,

§ 1, 63 Stat. 506. This is the version currently in effect.

Since section 143 is the direct descendant of the Anti-Smuggling Act of 1935, we think a discussion of the legislative history of that Act essential to the construction of the section. This history indicates that the predecessors of section 143 were not intended to affect the powers of the Coast Guard exercised beyond the primary jurisdiction of the Customs Service. In our opinion, this distinguishes section 143 from this case.

The Anti-Smuggling Act was occasioned by the failure of the repeal of prohibition to diminish substantially the smuggling of liquor into the United States. *See* Ficken, *The 1935 Anti-Smuggling Act Applied to Hovering Narcotics Smugglers Beyond the Contiguous Zone: An Assessment Under International Law*, 29 Miami L.Rev. 700, 708 (1975). A significant part of the smuggling trade was carried out by foreign vessels. Under then existing United States law, foreign vessels were immune from arrest beyond the twelve-mile limit notwithstanding treaties with several nations that allowed the seizure within one hour's sailing distance from the coast of foreign vessels engaged in the smuggling of liquor. The treaty provisions were unavailable beyond twelve miles because the United States revenue law had not been extended beyond that limit. *See id.* at 707 n. 25.

Congress enacted the 1935 Anti-Smuggling Act to expand the force of internal law to the limits provided by the treaties. *See* H.R.Rep.No.868, 74th Cong., 1st Sess. 2, 4 (1935). The Act also greatly enlarged the authority of customs officers to board and search vessels and to seize contraband within the enforcement area established by the Act. *See id.* at 12. To remove any ambiguities as to the authority of Coast Guard officers to avail themselves of this broader authority, Congress enacted the definitional provisions of the Act from which 14 U.S.C. § 143 derived.

---

11. Section 401 is repetitive of § 201 because the former merely amended a provision of the Tariff Act of 1930. Section 401 was thought necessary to make the definition applicable to provisions of the Anti-Smuggling Act that did

not amend the Tariff Act. *See* H.R.Rep.No.868, 74th Cong., 1st Sess. 14 (1935). Section 201 is now codified as 19 U.S.C. § 1401(i) (1976), and § 401 is codified as 19 U.S.C. § 1709(b) (1976). See note 7 *supra.*

The history of section 143 indicates unequivocally that its precursors were not designed to affect the authority of the Coast Guard regarding American vessels sailing beyond areas in which foreign vessels were subject to customs regulation. The jurisdiction of the Coast Guard over American flag vessels beyond the twelve-mile limit had been established under the holdings of *Maul* and its companion case, *United States v. Lee*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927). The same Congress that responded to *Maul* by enacting the precursor of section 89 also passed the Anti-Smuggling Act. We think the intent of Congress is clear: Congress meant that section 89 should define the authority of the Coast Guard over American vessels beyond the twelve-mile limit. That authority allows boardings without suspicion of illegality. Subsection c of section 89 interdicts any regulations that might impinge upon that authority. Therefore, we will not read section 143, which derives from an act designed to *expand* Coast Guard jurisdiction over *foreign* vessels, to *limit* the Coast Guard when acting pursuant to its powers under section 89 over *American* vessels beyond the twelve-mile limit. *Accord, The Underwriter*, 13 F.2d 433, 434 (2d Cir. 1926), *aff'd sub nom. Maul v. United States*, 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171 (1927). The probable-cause-for-boarding requirement of 19 C.F.R. § 162.3 does not apply to the boarding in this case.

### B.   *The* Miranda *Issue*

■ The issue we must determine is whether the *Miranda* warnings that were given Thomas Warren immediately after he produced the first envelopes, which contained money in excess of $5,000, came too late. The panel was of the opinion that the warnings should have been given before Thomas Warren's admission to Agent Wallace that he possessed more than $5,000. Apparently, the panel believed the defendants to be in custody at the time the questions concerning the amount of money each had on board were asked. Of course, it is the existence of a custodial atmosphere that invokes the necessity for the warnings. *Mi-randa*, 384 U.S. at 444, 86 S.Ct. at 1612; *United States v. Carollo*, 507 F.2d 50 (5th Cir. 1975), *cert. denied*, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1976).

The panel noted several circumstances that led it to the conclusion that the defendants were in custody at the time of the questioning. The defendants had gathered on the fantail of the *Stormy Seas*, their guns had been removed, the boarding party was armed, and the *Steadfast* stood by with three machine guns that could have been used to restrain the *Stormy Seas*. Under the special circumstances attending the boarding by the Coast Guard of a vessel on the high seas, we find that the restraint of the defendants in this case did not reach a level of custody that would require *Miranda* warnings at the time the questions concerning the money were asked.

■ It is essential at the outset to recognize the nature of the boarding and interrogation in this case. Every American flag vessel on the high seas is subject to Coast Guard boarding and inspection. See note 4 *supra*. Therefore, the coercive atmosphere that is the primal indicium of a custodial interrogation, *see, e. g., Hoffa v. United States*, 385 U.S. 293, 303–04, 87 S.Ct. 408, 414–15, 17 L.Ed.2d 374 (1966), is generally absent because such boardings are routine. This, of course, is not to say that such intrusions cannot be coercive, but the routine Coast Guard boarding and inspection of an American vessel on the high seas does not create a custodial situation. *Cf. United States v. Thompson*, 475 F.2d 1359, 1364 (5th Cir. 1973) (routine customs search does not require *Miranda* warnings). *See also United States v. Jones*, 543 F.2d 1171, 1173 (5th Cir. 1976), *cert. denied*, 430 U.S. 957, 97 S.Ct. 1604, 51 L.Ed.2d 807 (1977). Indeed, to hold otherwise would require the Coast Guard to read *Miranda* warnings to those on board every vessel it boarded.

■ We must, therefore, look beyond the routine boarding and interrogation in this case to determine when the warnings should have been given. This determination requires a case-by-case analysis. *E. g.,*

*Alberti v. Estelle*, 524 F.2d 1265, 1266–67 (5th Cir. 1975), *cert. denied*, 426 U.S. 954, 96 S.Ct. 3181, 49 L.Ed.2d 1193 (1976). The Fifth Circuit employs a four-factor test to ascertain whether an interrogation occurred in a custodial context. These factors include: (1) whether probable cause to arrest had arisen, (2) whether the subjective intent of the officer conducting the interrogation was to hold the defendant, (3) whether the subjective belief of the defendant was that his freedom was significantly restricted, and (4) whether the investigation had focused on the defendant at the time of interrogation. *United States v. Nash*, 563 F.2d 1166, 1168 (5th Cir. 1977); *Alberti v. Estelle*; *United States v. Carollo*, 507 F.2d 50 (5th Cir. 1975), *cert. denied*, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1976); *Brown v. Beto*, 468 F.2d 1284 (5th Cir. 1972); *United States v. Montos*, 421 F.2d 215 (5th Cir.), *cert. denied*, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). Under these factors, we think it clear that a custodial situation did not exist at the time Agent Wallace asked Thomas Warren how much money he had.

*Probable Cause.* Admittedly, Agent Wallace testified that he suspected that the *Stormy Seas* was on a narcotics run. The enrollment papers had listed no foreign port as a destination, but Thomas Warren stated that the purpose of the cruise was to purchase land in Colombia. John Warren and Cruse stated that the *Stormy Seas* had been employed for fishing and diving, but no ice was on board and the diving equipment was in obvious disrepair. These circumstances, although clearly sufficient to warrant further inquiry, would not have supported an arrest. It was not until Thomas Warren admitted that he had failed to report the $7,000 he claimed to possess that probable cause to believe a crime had been committed arose.[12] Indeed, the defendants agree. They argue that no probable cause to search the vessel or make arrests existed before Thomas Warren's admission. Brief of Appellant John L. Warren, Jr. at 25–26 & n. 28; Brief of Appellant Thomas Warren at 14 & n. 9. See note 5 *supra*.

*Subjective Intent of Officer.* It is clear that the subjective intent of the boarding party was to restrict the freedom of the *Stormy Seas*. But, as we have noted, this alone does not render the interrogation coercive. The freedom of every vessel that is boarded by the Coast Guard is restricted to the extent that the vessel is not free to leave until the inspection is completed. If the intent-of-the-officer criterion is to have any meaning in the context of a Coast Guard boarding, then the officer must intend to go beyond the restrictions imposed by the customary and routine boarding and search. Although Agent Wallace testified that he made the inquiries because he suspected that the purpose of the trip was to procure narcotics, the record does not reflect that he intended to take Thomas Warren into custody at that point.

*Subjective Belief of Defendants.* The issue of the effect of a customary Coast Guard boarding upon the minds of those on board a vessel such as the *Stormy Seas* is essentially the obverse of the one just discussed. To the extent that the boarding and inspection are routine, the defendants

---

12. We note that the foreign possession of more than $5,000 is not, in itself, a crime. The crime is the willful failure to report such money at the time of departure from the United States. *See United States v. Gomez Londono*, 553 F.2d 805, 810 n. 7 (2d Cir. 1977). Therefore, Agent Wallace had no probable cause to believe that the reporting provisions had been violated until Thomas Warren admitted that he had not reported.

Additionally, we do not think that Thomas Warren's admission that he possessed approximately $7,000 was sufficient, even in light of the circumstances that generated Agent Wallace's suspicion that the *Stormy Seas* was on a narcotics run, to create probable cause to believe that a conspiracy to import narcotics existed. The possession of $7,000 would have been consistent with too many legitimate purposes to warrant an arrest at the time the questions were asked. Moreover, even if we assume that there was probable cause to believe that the *Stormy Seas* was going to purchase narcotics in Colombia, there was no indication that the narcotics were to be imported into the United States, and importation is a necessary element of the substantive charge upon which the conspiracy indictment was based. *See* 21 U.S.C. § 952(a) (1970); Record, vol. 1, at 1 (Count I of the indictment).

should not feel coerced. In this case, it is clear that the defendants contemplated a boarding because they had devised a cover story to be used in that event. *See* Record, vol. 2, at 290–91. Moreover, John Cruse testified that just after the *Steadfast* was sighted, he advised the Warrens that the stop would be for a safety inspection. The record contains the following colloquy:

[MR. WHITTEN, the prosecutor:] Was there any discussion between you and either Mr. John Warren or Mr. Tommy Warren after the Coast Guard cutter was sighted?

[JOHN CRUSE:] Just that there was a Coast Guard boat coming, and they asked me what they wanted, and I told him that they checked safety inspection, you know, life jackets, fire extinguishers.

*Id.* at 291. Thus, although the defendants apparently believed that they would not be free to continue their voyage until inspection had been completed, they had no reason to feel coerced because they expected nothing more than a routine safety inspection.

The relevant inquiry is whether Thomas Warren believed that at the time of the questioning, the boarding and interrogation had gone so far beyond the customary that he was imminently subject to arrest. We think that the record indicates, however, that Thomas Warren believed the enterprise to be viable at that time. The trial judge found that Warren's responses were intended to corroborate his explanation that the cruise was undertaken to speculate in land in South America.[13] Therefore, we find that the record supports a determination that Thomas Warren did not believe his freedom to be significantly infringed at the time of the questioning.

*Focus of Investigation.* Agent Wallace's interrogation was merely investigatory until Thomas Warren admitted that he had not registered the money. It is only when the investigation shifts to the accusatory that it is sufficiently focused under this criterion. "Where the officers are merely trying to ascertain the facts to see if a federal crime has been committed, the accusatory stage has not yet begun." *Wakaksan v. United States,* 367 F.2d 639 (8th Cir. 1966), *cert. denied,* 386 U.S. 994, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967). *See generally Miranda,* 384 U.S. at 444 n. 4, 86 S.Ct. at 1612; *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Moreover, the rule in this circuit is that if none of the other factors are present, that the investigation is focused upon the defendant is insufficient to render the interrogation custodial. *United States v. Corollo,* 507 F.2d at 52–53. *See also Alberti v. Estelle,* 524 F.2d at 1267.

Our findings under these factors lead us to the conclusion that Thomas Warren was not due a reading of his rights at the time he answered the questions posited by Agent Wallace. The record indicates no further questioning until Thomas Warren produced the envelopes that contained money in excess of $5,000. At that time the warnings were given. It cannot be successfully contended that the production of these envelopes without prior warnings was violative of *Miranda,* because *Miranda* does not apply to the production of physical evidence. *See United States v. Moffett,* 522 F.2d 1379, 1381 (5th Cir. 1975); *United States v. Thompson,* 475 F.2d 1359, 1364 (5th Cir. 1973). Therefore, the evidence derived from Thomas Warren's admission that he had not reported the money was properly admissible at trial.

### C. *The Comment-on-Defendants'-Silence Issue*

■ Agent Battell testified at trial that Thomas Warren advised John Warren and Cruse to remain silent after their arrest. We must determine whether the reception of this testimony requires reversal of the convictions in this case. We hold that it does not.

---

**13.** The trial judge denied the motion to suppress because he felt Thomas Warren's responses to be voluntary. The court's reasoning was that they were made in furtherance of the cover story that the voyage was for land speculation. Record, vol. 2, at 133–34.

The testimony in issue was elicited by the Government during direct examination. The trial transcript reveals the following dialogue:

[MR. WHITTEN:] Agent Battell, did there come a time when all three persons on board the STORMY SEAS were read their rights?

[AGENT BATTELL:] Yes, sir.

[MR. WHITTEN:] Was there any conversation thereafter with persons on board?

[AGENT BATTELL:] Yes, sir, there was.

[MR. WHITTEN:] What was that?

[AGENT BATTELL:] John Warren—or, correction, Thomas Warren, stated, "I want to represent everybody," and requested the other individuals we had in custody not to say anything.

Record, vol. 2, at 221. Defense counsel objected immediately, and there was no further testimony on the matter. Most significantly, Agent Battell did not relate John Warren's reaction to the advice.

We think it manifest that the admission of this testimony did not constitute a comment on the *exercise* of the Warrens' right to remain silent. It is only where the accused is amerced for having exercised his constitutional rights that error is committed. This premise is implicit in the fundamental prohibition set out by the Supreme Court,

it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation.

*Miranda v. Arizona,* 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966). All that the testimony indicated was that Thomas Warren advised his brother and Cruse not to say anything. The jury could not have known whether the advice was in fact heeded. The testimony does not imply that Thomas Warren himself chose to exercise his right; he merely admonished the others not to speak.

That it was not brought forth at trial that the defendants in fact "stood mute or claimed [their] privilege" distinguishes the cases that the defendants claim require reversal. They proffer our decision in *Baker v. United States,* 357 F.2d 11 (5th Cir. 1966). *Baker* held that it was reversible error to allow an FBI agent to testify that the defendant requested a lawyer and "made no further statement" when first questioned. *Id.* at 13. As we said, "to have proven that [the defendant] made no further statement was, we feel, as objectionable as it would have been to comment on a defendant exercising his Constitutional right not to take the witness stand." *Id.* at 13–14. In this case there was clearly absent any proof that the defendants made no further statements. The same considerations distinguish the other case the defendants present, *Walker v. United States,* 404 F.2d 900 (5th Cir. 1968). In *Walker,* a Government witness testified that he asked the defendant, "Just how did you get my [stolen] credit cards?" *Id.* at 902, n. 1. The witness testified that the defendant responded, "I refuse to answer on the grounds it might incriminate me." *Id.* We noted, "When an accused responds to a question, or even to an accusation, with an assertion of a claimed legal or constitutional right, the jury should not be permitted to infer from such an assertion any consciousness of guilt or tacit admission." *Id.* at 902. Clearly, it was not evident that the defendants here asserted their rights, and therefore the jury could not have drawn any inference of "tacit admission."

Even if the jury could reasonably infer that the Warrens relied upon their fifth amendment rights, their silence would not have been the silence that speaks. They had not been confronted with accusations or even questions. Since the Warrens did not testify at trial, that they might have chosen to remain silent after their arrest could not impugn an exculpatory explanation offered to the jury. This case, therefore, is not like *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 48 L.Ed.2d 91 (1976); *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99

(1975); *Chapman v. United States,* 547 F.2d 1240 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); or *United States v. Impson,* 531 F.2d 274 (5th Cir. 1976). In those cases, error was found because "the point upon which a defense was being constructed, [the exculpatory testimony of the defendant], was arguably damaged or impeached by proof of the defendant's silence when arrested." *United States v. Impson,* 531 F.2d at 276. This case comes within the distinction we made in *United States v. Griffin,* 530 F.2d 101, 103 (1976), where we said, "Unlike the prosecutor in [*United States v.*] *Hale,* [422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975)] this prosecutor did not develop the prejudicial picture of an accused remaining silent in the face of police interrogation at the time of the arrest."

### D. *The* Bruton *Issue*

■ The issue for determination here is whether *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), required the district court to grant John Warren's motion for severance after Agent Battell related at trial Thomas Warren's comment, "We are all in this together." Record, vol. 2, at 214. Thomas Warren made this statement during his initial conversation with Agents Battell and Wallace, just after he, Thomas Warren, had produced the three pistols. We hold that the admission of this statement did not violate the rule of *Bruton.*

*Bruton* established that a codefendant's confession that implicates the defendant is inadmissible in a joint trial if the codefendant refuses to take the stand. Implicit in the holding in *Bruton* is that the codefendant's confession would have been inadmissible against the defendant in a separate trial. *See id.,* 391 U.S. at 128 n. 3, 88 S.Ct. at 1623; *United States v. Archibold-Newball,* 554 F.2d 665, 677 (5th Cir.), *cert. denied,* 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977); *United States v. Scholle,* 553

F.2d 1109, 1119 (8th Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). Although we recognize that it is not true that all evidence admissible in a separate trial under exceptions to the hearsay rule necessarily comports with sixth amendment confrontation requirements, *see Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970), it is established that statements that are admissible under the coconspirator exception to the hearsay rule do not run afoul of *Bruton. United States v. Archibold-Newball,* 554 F.2d at 677; *United States v. Scholle,* 553 F.2d at 1109, 1119–20; *Park v. Huff,* 506 F.2d 849, 860 (5th Cir.) (en banc), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *McGregor v. United States,* 422 F.2d 925, 926 (5th Cir. 1970); *see Dutton v. Evans,* 400 U.S. at 85–88, 91 S.Ct. at 218–19.

Fed.R.Evid. 801(d)(2)(E) makes admissible against a party "a statement by a coconspirator of [that] party during the course and in furtherance of the conspiracy." [14] *See Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). Unquestionably, Thomas Warren's statement was made while the conspiracy was viable. As we said in *United States v. Arias-Diaz,* 497 F.2d 165, 171 (5th Cir. 1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975), "a person's role in a conspiracy ends with his arrest." Thomas Warren made the comment shortly after the boarding and long before any arrests had been made and even before there was probable cause to believe that a crime of any type had been committed. See note 12 *supra* and accompanying text. Thus, the comment was clearly made "during the course of the conspiracy."

The closer question is whether the statement was made in furtherance of the conspiracy. To place the comment in the proper context, we reproduce the following excerpt from the transcript at trial. It follows Agent Battell's testimony describing the boarding of the *Stormy Seas,* immedi-

---

**14.** Technically, under the Federal Rules statements by coconspirators are admissible not because they fall within an exception to the hearsay rule but because they are not hearsay at all. *See United States v. Brown,* 555 F.2d 407, 422 n. 35 (5th Cir. 1977).

ately after which he and Agent Wallace approached Thomas Warren.

[MR. WHITTEN, the prosecutor:] What was the conversation you had with Mr. Tom Warren?

[AGENT BATTELL:] I asked him if he had any guns aboard.

[MR. WHITTEN:] What did he say?

[AGENT BATTELL:] He replied in the affirmative and took myself and Mr. Wallace to the deck house where he showed us three pistols.

[MR. WHITTEN:] Did you have any further conversation with Mr. Tom Warren about anything else?

[AGENT BATTELL:] Yes, I did.

[MR. WHITTEN:] What was the subject matter of that conversation?

[AGENT BATTELL:] Mr. Warren stated that—Mr. Warren expressed confusion. He said, "What's this all about? We are all in this together," and he exhibited ___

Record, vol. 2, at 213–14. At this point defense counsel objected on the basis of *Bruton.*

To place this testimony in fuller context, we refer to Agent Battell's earlier testimony at the suppression hearing. Describing these same events, he stated as follows:

[AGENT BATTELL:] I stated, "Why do you have these guns aboard?"

Conversation ensued, in which he stated that he was going down to South America, I believehe [*sic*] said to Aruba, to make a land transaction.

Record, vol. 2, at 80. This is all the transcript reveals regarding the context in which Thomas Warren made the statement in issue.

Although the transcript is somewhat ambiguous as to what Thomas Warren was referring when he said, "We are all in *this* together," the most reasonable interpretation is that he was referring to the supposed land investment enterprise, which was proffered as a cover story. On the testimony in the record, any other interpretation would render the statement wholly gratuitous. When the statement is taken to refer to the land investment scheme, it furthers the narcotics conspiracy because it implies that the Warrens and Cruse were jointly participating in an alternative, legitimate enterprise. Indeed, the statement might have been an attempt to explain why three pistols, which had just been produced, were on board. Thomas Warren might have wished to give the impression that the guns were to be used by him, John Warren, and Cruse for protection while they were in South America transacting the land investment plan. In any event, since the testimony is susceptible of a reasonable interpretation that is consistent with the trial judge's refusal to grant the motion for severance that he made when the statement came into evidence, we will not construe a cold record to the contrary.

The statement was properly admissible against John Warren as a statement made by the coconspirator, during and in furtherance of the conspiracy. *See United States v. Pate,* 543 F.2d 1148, 1149 (5th Cir. 1976). As such, it does not violate the precepts established in *Bruton.* [15]

---

**15.** We note that even if the statement were not admissible under the coconspirator rule, it is doubtful that its admission would contravene *Bruton.* The statement was hardly crucial to the government's case, in contrast to the confession that was admitted in *Bruton. See id.,* 391 U.S. at 128, 88 S.Ct. at 1623; *Dutton v. Evans,* 400 U.S. 74, 87, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970). John Warren was clearly implicated by Cruse's testimony. He was serving as navigator of the *Stormy Seas* and had supplied a boat to be used to unload the marijuana upon return to the United States.

Moreover, the statement is not clearly and directly inculpatory of John Warren. He was not mentioned by name, and the statement did not refer to any criminal activity. We think this statement hardly more incriminating than one calling for the division of the proceeds of a bank robbery "four ways" among conspirators, a comment we held not to be directly inculpatory of a codefendant in *United States v. Hicks,* 524 F.2d 1001, 1002–03 (5th Cir. 1975), *cert. denied,* 424 U.S. 946, 96 S.Ct. 1417, 47 L.Ed.2d 353 (1976). *See United States v. Grillo,* 527 F.2d 1344 (5th Cir. 1976).

In sum, Thomas Warren's statement was "of peripheral significance at most." *Dutton v. Evans,* 400 U.S. at 87, 91 S.Ct. at 219. It added

### E.  *The Fed.R.Evid. 615 Issue*

■   The Government concedes and the panel found that the trial judge committed error, in violation of Fed.R.Evid. 615, when he refused to exclude the Government's witnesses from the courtroom during the suppression hearing.  The rule, by its terms, is mandatory: "At the request of a party the court *shall* order witnesses excluded so that they cannot hear the testimony of other witnesses  .  .  .  ."  (Emphasis supplied.)  Defense counsel requested that the rule be invoked at the beginning of the hearing, before any testimony had been received.  Record, vol. 2, at 14.  The rule was later applied at trial.  Therefore, the only issue before us here is whether the violation of the rule at the suppression hearing requires reversal.  We hold that it does not.

■   The defendants do not seek a new suppression hearing.  Indeed, it would be meaningless for them to do so, given the purposes of the rule.  The rule is designed to avoid the testimony of one witness improperly influencing that of another and to aid in the detection of disingenuous testimony.  *See Geders v. United States,* 425 U.S. 80, 87, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 615[01], at 615–4 (1976).  The effects of any such influence would not be erased by a new suppression hearing, and the opportunity to uncover any such testimony has passed.  What the defendants must be seeking therefore (they request no particular relief) is a reversal of the convictions and a new trial without Government witnesses.  We decline to read such a draconian sanction—tantamount to an exclusionary rule—into rule 615.  *See United States v. Whiteside,* 404 F.Supp. 261, 266 (D.Del.1975).

Since we construe the violation of the rule not to require the automatic exclusion of testimony, the defendants must demonstrate that the trial judge's error created sufficient prejudice to require reversal.[16] The defendants did not object at trial to the calling of the Government's witnesses. They did not move for mistrial on the basis that the witnesses' trial testimony was materially influenced by their exposure to the testimony of other witnesses at the suppression hearing.  The defendants' failure to denote prejudice is particularly significant given the unique opportunity afforded them by their access to transcripts of depositions of the Government's witnesses that had been taken in connection with a state prosecution arising out of the same transaction in issue here.  *See* Record, vol. 2, at 333–35. The defendants have pointed to no prejudicial effects of the trial judge's failure to apply the rule at the suppression hearing; absent a showing of prejudice we shall not reverse these convictions.

### F.  *The Currency Convictions*

Several recent opinions of this circuit have invalidated convictions under 31 U.S.C. § 1058 (1970) for transporting or causing to be transported monetary instruments in an amount exceeding $5,000 without filing the report required by 31 U.S.C. § 1101 (1970).  *United States v. Schnaiderman,* 568 F.2d 1208 (5th Cir. 1978), and *United States v. Granda,* 565 F.2d 922 (5th Cir. 1978), construed the language in section 1101 requiring that the failure to report be "knowing," and that in section 1058 calling for a "willful" violation of section 1101, to

---

insignificant, if any, weight to the Government's strong case against John Warren.

**16.**  Our holding that a violation of rule 615 does not call for the automatic exclusion of witnesses or testimony is consistent with the principle that the failure of a witness to comply with a sequestration order does not alone render his testimony inadmissible.  *See United States v. Suarez,* 487 F.2d 236 (5th Cir. 1973), *cert. denied,* 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878 (1974).  Whether to exclude a witness who violated the order is left to the sound discretion

of the trial judge, and he ordinarily will not exclude witnesses without a demonstration of probable prejudice.  *E. g., United States v. Phifer,* 400 F.Supp. 719, 734 (E.D.Pa.1975), *aff'd,* 532 F.2d 748 (3d Cir. 1976).  Moreover, the failure of the trial judge to order a mistrial when witnesses who have violated sequestration orders nevertheless testify will not justify reversal on appeal absent a showing of prejudice sufficient to constitute an abuse of discretion.  *United States v. Eastwood,* 489 F.2d 818 (5th Cir. 1973).

necessitate a demonstration that a defendant indicted under these statutes had knowledge of the reporting requirement and a specific intent to commit the violation. The cases went further to invalidate, as a matter of law, any convictions under section 1058 for violation of section 1101 "unless affirmative steps are taken by the government to make the laws' requirements known." *Schnaiderman,* 568 F.2d at 1211 (quoting *Granda,* 565 F.2d at 926).

So as not, by our silence, to impugn these holdings, we expressly invoke the concurrent sentence doctrine. Since the court imposed upon the Warrens concurrent sentences of eighteen months for the marijuana conspiracy and six months for the currency violations, we affirm on the basis of conspiracy convictions and pretermit review of the currency convictions.[17] *See Hirabayashi v. United States,* 320 U.S. 81, 85, 63 S.Ct. 1375, 1378, 87 L.Ed. 1774 (1943); *United States v. Kelly,* 569 F.2d 928 (5th Cir. 1978).

## IV. *Conclusion*

For the reasons stated above, we AFFIRM the convictions of John Warren and Thomas Warren. The panel's dispositions of the convictions of David DeFina and Des Schick, reversing that of the former and affirming that of the latter, are left undisturbed.

RONEY, Circuit Judge, with whom SIMPSON, Circuit Judge, joins, dissenting:

I agree with the result and most of the legal reasoning contained in Judge Fay's dissenting opinion. Because the majority opinion does not seem to have the breadth Judge Fay ascribes to it, however, I write separately to clarify the critical difference between the majority and dissenting positions, as I understand them, and to emphasize the significance of our decisions in *United States v. Schnaiderman,* 568 F.2d 1208 (5th Cir. 1978), and *United States v. Granda,* 565 F.2d 922 (5th Cir. 1978).

All seem to agree that although section 89(a), as written, would empower the Coast Guard to board any American vessel and fully search it, without probable cause, for any reason whatsoever, the broad statutory language has been judicially construed in a more restrictive manner: the Coast Guard's power to stop and board vessels is limited to conducting safety and documentation inspections. Majority opinion at 1064–1065; dissenting opinion of Judge Fay at 1079; *see United States v. Hillstrom,* 533 F.2d 209, 210 (5th Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); *United States v. Odom,* 526 F.2d 339, 341–342 (5th Cir. 1976); *United States v. One 43 Foot Sailing Vessel,* 405 F.Supp. 879, 882 (S.D.Fla.1975), *aff'd per curiam,* 538 F.2d 694 (5th Cir. 1976).

Likewise, all agree that if circumstances arise during the course of such safety inspection that generate probable cause to believe that a violation of United States law has occurred, then, and only then, the Coast Guard may extend its inquiry, conduct searches, seize evidence, and make arrests. Majority opinion at 1065; dissenting opinion of Judge Fay at 1079; *United States v. Odom, supra,* 526 F.2d at 342.

Although some unfortunate phrasing in the majority opinion would indicate a "plenary" power to search without cause, a careful interpretation of the opinion and of the cases therein relied upon show that it supports only a "plenary" power to stop, a principle with which we all agree. The majority's statement that without reservation section 89(a) is constitutional, read in

---

17. The arrests in the present case were effected prior to our holdings in *United States v. Schnaiderman,* 568 F.2d 1208 (5th Cir. 1978), and *United States v. Granda,* 565 F.2d 922 (5th Cir. 1978). Even assuming that the convictions on the currency violation could not be upheld, the arrests and search in this case are valid. The validity of an arrest depends upon the reasonableness of the officers' actions at the time of the arrest and not upon what a court may glean from a statute three and a half years later. This rule is well established even where the statute under which the arrest was made is later declared unconstitutional. *Moffett v. Wainwright,* 512 F.2d 496, 502 n. 6 (5th Cir. 1975) (quoting *United States v. Kilgen,* 445 F.2d 287, 289 (5th Cir. 1971)).

light of the cases cited and the immediately subsequent statement that the Coast Guard may board vessels for safety checks and then, *if* probable cause arises, make further searches, clearly indicates the majority did not mean to change the law from that announced in *United States v. Odom, supra.* Had the majority intended to authorize the Coast Guard to make complete searches of vessels without probable cause, the present search could have been upheld without any further discussion. But the majority opinion carefully explicates the initial stop as a safety check, during which the agents acquired probable cause to conduct a further search.

It is here that the majority and dissent differ, and it is here that I agree with Judge Fay that the search and seizure were unconstitutional.

In our prior cases, evidence of illegality was found either in plain view or during the course of the safety inspection. *United States v. Hillstrom, supra,* 533 F.2d at 210–211 (plain view); *United States v. Odom, supra,* 526 F.2d at 341–342 (burlap sacks containing marijuana discovered while looking for the main beam identification number); *United States v. One 43 Foot Sailing Vessel, supra,* 405 F.Supp. at 883–884 (plain view and "overpowering" aroma of marijuana on ship).

In contrast to these cases, the agents here were from the outset engaged in an affirmative investigation beyond the scope of a safety inspection, in which they sought out evidence of illegality through questioning the vessel's occupants and searching the boat. Although the majority describes the agents' preliminary search as "cursory," there is no constitutional exception for "cursory" searches, even if this search could be considered "cursory." Regardless of how one designates the search that took place before the questioning and the search thereafter, it is clear beyond dispute that the agents engaged in an affirmative investigation beyond a safety and documentation inspection, without probable cause. The Coast Guard was without constitutional authority to conduct such an investigation.

The argument concerning the presence of Customs and DEA agents seems to me of little importance. I would think it makes little difference if other agents board a vessel along with Coast Guard officers, *provided* they do no more than what the Coast Guard is permitted to do. That proviso invalidates the current search: the Customs and DEA agents conducted an investigation beyond the safety inspection, and since Coast Guard officers cannot do that, neither can the agents accompanying the Coast Guard. So long as the other agents do no more than the Coast Guard could, I see no problem of constitutional dimensions. If special expertise is thus available for detecting customs and drug violations during a permitted inspection, so be it. *Cf. United States v. Hillstrom, supra,* 533 F.2d at 211 (safety inspection, and seizure of marijuana in plain view during that inspection, not invalid because suggested by DEA agent, who suspected drugs might be on board). Any other rule could deprive the Coast Guard of the aid of other experts in the fight against crime, much as if Inspector Baynes of the Surrey Constabulary were prevented from calling on Sherlock Holmes for assistance.

Although defendant's currency convictions should also be reversed under our opinions in *United States v. Schnaiderman,* 568 F.2d 1208 (5th Cir. 1978), and *United States v. Granda,* 565 F.2d 922 (5th Cir. 1978), unless the en banc court should choose to reject them, these cases bear even a greater significance when juxtaposed against the facts upon which the majority partially relies for probable cause. *Schnaiderman* and *Granda* hold that a person is not guilty under 31 U.S.C.A. § 1058 for failing to file the report required by 31 U.S.C.A. § 1101 when transporting more than $5,000 out of the country, unless the person had knowledge of the reporting requirements and a specific intent to commit the violation. Unless the Government makes the reporting requirement known to a defendant, we indicated that it may be impossible to prove beyond a reasonable doubt that defendant acted with knowledge

of the reporting requirements. In the present case, the agents only asked Thomas Warren if he had reported taking the money out of the country and filled out the proper forms, to which he replied he had not. He was never asked if he knew he had to report it, nor did the agents give him an opportunity to fill out the appropriate forms once they discovered the money on board the *Stormy Seas*. *See United States v. Gomez Londono*, 553 F.2d 805 (2d Cir. 1977), and *United States v. San Juan*, 545 F.2d 314 (2d Cir. 1976). Thus the evidence of a committed crime is considerably weakened, and does not deserve the reliance placed upon it by the majority opinion.

The majority refuses to confront these currency convictions under the concurrent sentence doctrine. I respectfully dissent from such use of the concurrent sentence doctrine. Although I am ready, I think, to retire the concurrent sentence doctrine entirely, it should not be applied in any event where convictions for entirely different offenses will undoubtedly affect a defendant's future adversely.

One further note. I underline Judge Fay's suggestion that the holding of a Coast Guard stop on the high seas at gunpoint to be not custodial is unsupportable in real life. "Whoever makes the regulations doesn't row a boat." R. Bolt, *A Man for All Seasons*, 29 (Random House 1962).

Agreeing with Judge Fay's analysis that the facts in this record reflect an illegal search, that the admissions were the result of custodial interrogation, and holding that *Schnaiderman* and *Granda* require a reversal of the currency convictions, I would reverse.

GODBOLD, Circuit Judge, dissenting:

I concur in Judge Roney's dissenting opinion, except the portion relating to the currency violations.

FAY, Circuit Judge, with whom GOLDBERG and LEWIS R. MORGAN, Circuit Judges, join, dissenting:

Most respectfully, I dissent. It is my belief that the constitutional rights of American citizens have been dealt a severe blow by today's *en banc* opinion, and I am somewhat stunned by the cursory treatment this opinion gives to certain serious constitutional and factual issues. My thoughts as to this case remain the same as those expressed in the Court's initial opinion, 550 F.2d 219 (5th Cir. 1977), but I feel it is necessary to write further in order to better explain these thoughts and to point out what I consider to be the serious weaknesses in the Court's position.

A. The Fourth Amendment Problems

No one can question that the Coast Guard may stop and search an American vessel on the high seas when it has probable cause to believe a crime has been or is being committed. Prior cases have indicated that such actions are not violative of the Fourth Amendment. *See, e. g., United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); *Maul v. United States,* 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171 (1927). As discussed in the original panel opinion, the Coast Guard may also stop an American vessel on the high seas for the purpose of conducting a safety or documentary inspection. This Court has previously approved of such stoppings, and has also endorsed as a corollary to this proposition that if circumstances arise during the course of a safety inspection that generate probable cause to believe that a violation of United States law has occurred, then the Coast Guard may extend its inquiry, and seize evidence and make arrests if necessary. *See United States v. Odom,* 526 F.2d 339 (5th Cir. 1976). What is baffling is how a majority of our Court can feel that the facts of this case fall within any of the legal principles just recited. Equally as shocking is the suggestion by the majority opinion that these legal principles do not set out the constitutional limits on searches and seizures on the high seas.

The proper Fourth Amendment analysis for this case should begin with a recognition that any detention by the Coast Guard of an American vessel anywhere in the world constitutes a "seizure" as that term is used

in the Fourth Amendment.[1] While warrantless seizures absent probable cause are seldom constitutional, the Coast Guard may constitutionally seize an American vessel for the limited purpose of conducting a documentary and safety inspection. It is critical, however, to recognize that the constitutionality of such a seizure hinges on the Coast Guard limiting the scope of its intrusion to the purpose of the initial seizure. The moment the Coast Guard absent probable cause enlarges the scope of its inquiry beyond that of a safety and documentary inspection, the seizure is no longer constitutional, and all evidence derived from inquiries as a result of the expanded intrusion is unconstitutionally obtained and inadmissible at trial.

In the case before us, all evidence of criminal wrongdoing was obtained as a result of the efforts of two governmental officers whose only purpose on board the Coast Guard cutter was to look for obvious customs and narcotics violations. Upon boarding the Stormy Seas, these two officers immediately began an extensive and highly intrusive search of the vessel. This search, and the inquiries related to it, were in no way connected with the safety and documentary inspection then being conducted by Coast Guard personnel. Indeed, Lt. Miller, the Coast Guard officer leading the boarding party, testified forthrightly that Agent Battell of the DEA and Agent Wallace of the Customs Service gave him no assistance in conducting the safety and documentary inspection. Record, Vol. 2, at 24. At the time this search and related inquiries were made by Battell and Wallace, no government agent had learned of facts giving rise to probable cause that a crime had been committed. The efforts of Agents Battell and Wallace were, therefore, outside of the parameters of the only constitutional basis for the stop—a safety and documentary inspection. As a result, the evidence derived from the seizure of the Stormy Seas was unconstitutionally obtained.

In order to better understand the rationale underlying my analysis of the Fourth Amendment issues in this case, and to better explain the serious misgivings I have over the far reaching effects of the majority opinion, it is necessary to examine very closely the potential effect of the broad language used by the *en banc* Court, and to compare this language with other search and seizure situations. The majority opinion states flatly that the power of the Coast Guard to apprehend any vessel of the American flag is "plenary". Majority opinion p. 1064. The opinion also states without reservation that § 89(a) is constitutional. *Id.* A close examination of § 89(a), however, reveals that it would authorize the Coast Guard to seize any American vessel anywhere in the world without probable cause and for no purpose whatsoever other than to conduct a full scale search for possible drug or other criminal violations. It is difficult to believe that the *en banc* Court feels that such action by the Coast Guard would be constitutional, but the broad language of its opinion suggests that this is so. The majority opinion is, therefore, seriously flawed not only by its attempts to reconcile the facts of this case under the legal principles set forth in *United States v. Odom*, 526 F.2d 339 (5th Cir. 1976), but also by its suggestion that those principles set forth in *Odom* are not the outer limits of the Coast Guard's lawful authority to stop and search American vessels on the high seas.

The majority's refusal to establish constitutional limitations on search and seizures on the high seas creates an extraordinary and anomalous result. The majority apparently is willing to give the Coast Guard unfettered discretion to seize American vessels on the high seas even though we must be aware of the fact that the Supreme Court has said that such a grant of discretion to a Border Patrol officer on a roving patrol would be unconstitutional. In *Unit-*

---

1. This point will be discussed *infra.* For now I need only relate the principle of law stated in *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that whenever a government officer accosts a person and restrains his freedom to leave, the government officer has "seized" that person.

ed States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court discussed at length the Fourth Amendment limitations on the authority of the United States Border Patrol to stop (seize) automobiles near the Mexican border in order simply to question the occupants about their citizenship and immigration status. The Court's analysis began with the recognition that "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest," and that whenever a government officer seized a person the "Fourth Amendment requires that the seizure be 'reasonable'". Id. at 878, 95 S.Ct. at 2578. As with other categories of police action subject to Fourth Amendment constraints, "the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Id.

The Supreme Court identified the public interest at stake in a seizure by a roving Border Patrol officer as the need to prevent the illegal entry of aliens at the Mexican border. The Court recognized that the common Mexican-American border was over 2000 miles long and that it would be impossible to effectively police this border. This impossibility has resulted in an influx of over one million illegal aliens a year which creates "significant economic and social problems." Id.

Against this valid public interest of attempting to regulate the flow of aliens, the Court then weighed the interference with individual liberty that results when an officer stops an automobile and questions its occupants. The Court concluded that such an intrusion is modest since it usually consumes no more than a minute, there is no search of the vehicle or its occupants, and the visual inspection is limited to those

parts of the vehicle that can be seen by anyone standing alongside. Because of the limited nature of the intrusion, stops of this sort "may be justified on facts that do not amount to the probable cause required for an arrest." Id. at 880, 95 S.Ct. at 2580. However, the Court was very careful to point out that seizures of this sort could not be made at the mere whim of Border Patrol officers, but rather "only if [the officers] are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." Id. at 884, 95 S.Ct. at 2582. The Court emphasized that the stop and inquiry must be reasonably related in scope to the justification for the intrusion. The officer "may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." Id. at 881–82, 95 S.Ct. at 2580.

The Supreme Court was unwilling to grant a roving border patrol unfettered discretion to seize vehicles, but, for some reason left unexplained by the majority opinion, our Court implies that a grant of similar discretion to a Coast Guard officer on a patrol thousands of miles away from the United States would be constitutional. Perhaps the majority feels that there are greater exigencies involved in a confrontation between the Coast Guard and an American vessel on the high seas (possibly thousands of miles away from the United States), than are present in a confrontation between a traveler and a Border Patrol officer near the Mexican border. If so, I disagree. Certainly the laws attempting to be enforced by the Border Patrol are just as important as those laws or treaty obligations that the Coast Guard is attempting to enforce,[2] and there can be no doubt that the

2. In fact, it appears that the alien problem is presently much more serious than the problem of insuring that American vessels have complied with safety regulations so that the high seas will be safe for international shipping. But, I think this Court is kidding itself if it

thinks that the purpose for the majority of the stops in that part of the Western Hemisphere where the Stormy Seas was found is for safety and documentary inspections. What the Coast Guard is rightfully concerned about is the large amount of drugs imported into the United

threat to the United States generally is much more immediate in the roving patrol situation than it is on the high seas. It is also rather obvious that the interference with individual liberty is much graver in a case such as that before us today, than is the "modest" interference in the Border Patrol situation. Section 89(a) would allow without probable cause or any degree of suspicion a seizure of indefinite duration (not to mention a complete interrogation and search of all the occupants as well as the vessel). This sort of interference is exactly the type of serious governmental interference that the Fourth Amendment was attempting to protect against, yet the language of the majority opinion would sanction just this without even attempting to rationalize this position under the Fourth Amendment.

The roving border patrol situation is not the only instance in which the public interest and exigencies facing a particular governmental officer would appear as great or greater than the exigencies or public interest involved with the Coast Guard on the high seas. For example, the circumstances facing a police officer on the streets when a crime has recently been committed (and the immediate threat to the public as a result of the crime) are significantly greater or more exigent than those facing the Coast Guard on the high seas. Nevertheless, the Supreme Court has restricted the power of the police officer to stop and frisk a citizen for investigatory purposes. The Court has required an officer in such a situation to have a reasonable belief that the person to whom he wishes to speak has been or was about to engage in some sort of criminal activity, *Adams v. Williams*, 407 U.S. 143, 145–146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), and before the officer is allowed to frisk that person, he must have reason to believe that he is armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The fact that the Supreme Court has refused to grant the government unfettered discretion to seize vehicles or persons in situations which appear on their face more critical than a confrontation between an American vessel and the Coast Guard on the high seas, indicates that such a grant of authority to the Coast Guard would likewise be unconstitutional since a ship or vessel is not some sort of talisman in whose presence the Fourth Amendment fades away. That is not to say, however, that any seizure by the Coast Guard on the high seas absent probable cause would be unconstitutional. It is merely the grant of a blanket authority to seize on the high seas which cannot be justified under the Fourth Amendment. It is interesting to consider how limited the situations are in which governmental officers are given blanket authority to search or seize. The obvious ones are at an actual border crossing or when a vessel is found within customs waters. But, the exigencies inherent in these situations adequately justify such a grant of authority. In the border situation, the Supreme Court has explained that it is within the power of the government to exclude aliens from this country, and, as a consequence of this power:

> "Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belonging as effects which may be lawfully brought in."

*Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973), *quoting Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The same policy reason exists for allowing warrantless non probable cause searches and seizures of vessels within twelve miles of the coast. However, in addition to this reason, the search and seizure within customs waters is further justi-

---

States by vessels in that part of the world. I do not think, however, that the problem is any different or more critical on the high sees near Haiti than it is on the Mexican border, and, as a result, I see no reason why a possible drug

importer on the high seas should have fewer rights when confronted by the Coast Guard than should a person on land near the Mexican border when confronted by an officer of the Border Patrol.

fied by the admitted difficulty in effectively policing the seaward national boundaries.

The majority opinion has brought forth no circumstances attempting to justify the grant of discretion it gives to governmental officers on the high seas. The most obvious explanation for this is that no such circumstances exist. While the need to inspect for safety and documentary reasons is legitimate, it is no more compelling than the need of a roving patrol to control the influx of aliens. Nor can it be argued that the problem of preventing drug importations is any greater on the high seas than it is at the Mexican border. It is impossible to rationalize under the Fourth Amendment a seizure of an American vessel for an indeterminate amount of time in order to inquire about possible drug violations. However, this is not to say that stoppings and searches of a less intrusive nature cannot be justified. Previously, this Court has sanctioned the stopping of American vessels on the high seas for safety and documentary inspections. By so doing, we have accepted the argument that this country has a duty to the rest of the world to effectively control American ships as to their administrative and technical matters. I have no real problem with this position, and I think such stoppings and searches are analogous to the warrantless administrative searches which are permissible in highly regulated business such as liquor and firearms. In fact, the Supreme Court's statement in *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), where it authorized the warrantless inspections of firearm dealers, is most applicable to our situation:

> We have little difficulty in concluding that where, as here, regulatory inspections further [an] urgent federal interest, and the possibilities of abuse and the threat to privacy are not of impressive dimensions, the inspection may proceed

without a warrant where specifically authorized by statute.

*Id.* at 317,[3] 92 S.Ct. at 1597.

Assuming that Coast Guard stoppings on the high seas and limited administrative type searches are constitutional, such a stopping would retain its cloak of constitutionality only as long as the intrusion remains limited in scope. The moment the intrusion is extended in any way—absent probable cause to justify such an extension—then the seizure and search become unconstitutional. Placing such a condition on the constitutionality of a search and seizure is in no way unusual. As mentioned earlier, the Supreme Court did just this when it stated that any stop and inquiry by the Border Patrol must be "reasonably related in scope" to the justification for the intrusion, and "further detention or search must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. at 881–82, 95 S.Ct. at 2580. A similar limitation on the scope of a Fourth Amendment intrusion was placed on a police officer in a "stop and frisk" situation. The Supreme Court said in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) that:

> The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.

*Id.* at 29, 88 S.Ct. at 1884. The Supreme Court then examined the scope of the search conducted by the police officer in question and determined that the officer had confined his search "strictly to what was minimally necessary to learn whether the men were armed and to disarm them

---

**3.** It would be interesting to consider what effect the Supreme Court's recent opinion in *Marshall v. Barlow's, Inc.*, —— U.S. ——, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) has on the propriety of even an administrative stopping for the limited purpose of a safety and documentary check. The Court in *Marshall* invalidated warrantless inspections of employment facilities which fall under the jurisdiction of the Occupational Safety and Health Act of 1970. Is it possible that a warrantless stop limited in scope to safety violations is not justifiable under the Fourth Amendment? This particular point is beyond the scope of this dissent, but is nevertheless something the majority opinion ought to have discussed.

once he discovered the weapons." *Id.* at 30, 88 S.Ct. at 1884. The Court concluded by emphasizing that the officer "did not conduct a general exploratory search for whatever evidence of criminal activity he might find." *Id.*

In our case, the sole constitutional justification for the initial seizure was to conduct a safety and documentary inspection, and, as we examine the facts, it becomes apparent that the government did not confine its inquiry to what was reasonably necessary to determine if there were any safety or documentary violations. Instead, the government treated the stop as an exploitable opportunity to look for whatever evidence of criminal activity might be found.

No one can doubt that the inquiry by the government in this case went far beyond what was necessary to look for safety and documentary violations. The government admits that the presence of the Drug Enforcement Administration and Customs officers had nothing to do with safety and documentary inspections. Rather, these officers boarded the Stormy Seas to look for customs and drug violations,[4] and, in furtherance of this purpose, they conducted an extensive search of the Stormy Seas. This search included going through all areas of the boat, opening closets, cabinets, drawers, and even going through personal items such as one of the defendant's shaving kits. Record, Vol. 2, at 62, 74–76. Did the government officers really expect to uncover safety violations inside the drawer of the nightstand or inside any of the cupboards—much less inside of a shaving kit? Agent Wallace also admitted that the sole purpose for his inquiry to Thomas Warren about money was because he suspected the purpose of the trip was to bring back narcotics, and, if this suspicion was correct, then there might be money on board.[5] Record, Vol. 2, at 77. The inquiry about money, therefore, had nothing to do with a safety and documentary inspection.

The *en banc* opinion concedes that no governmental agent who boarded the Stormy Seas had probable cause to believe a crime had been committed until Thomas Warren admitted that he had failed to report the $7000.00 he claimed to possess.[6]

---

**4.** On cross examination, Agent Wallace admitted that he was looking for weapons, drugs, money, and "any violation that I could find, possibly a gold violation, any violation that Customs would handle." Record, Vol. 2, at 74.

**5.** Agent Wallace testified that the reason he suspected the ship was on a trip to bring back narcotics was because he had gotten conflicting stories from the Warrens and Cruse about the purpose of the trip. Record, Vol. 2, at 77. Thomas Warren had stated that he was going to Colombia to look at land while Cruse had stated that the Warrens had chartered his boat to go fishing and diving. Record, Vol. 2, at 62–63. Are these two stories in conflict? What would be so unusual about Thomas Warren wanting to go to Colombia for business purposes yet wanting to fish or dive along the way? And, would it be unusual for John Warren to have a different purpose for the trip than his brother? The truth of the matter most likely is that Agent Wallace suspected that the purpose of the trip was for drugs the minute he got on board, and nothing the defendants did caused him to believe otherwise. As a result, Agent Wallace continued to expand his inquiry until he heard and found what he wanted. Unfortunately, this is not the way to constitutionally conduct a safety and documentary stop. A constitutional stopping would be limited in nature, and expansion of the inquiry would be impermissible until the government agents had probable cause to believe a crime had been committed.

**6.** The *en banc* opinion's treatment of the existence of probable cause is worth examining since the Coast Guard's ultimate search and seizure of the Stormy Seas is justified on this theory. The analysis of the *en banc* opinion places the boarding, interrogation and search of the Stormy Seas within the principle of law set forth in *United States v. Odom*, 526 F.2d 339 (5th Cir. 1976). This principle of law is that the Coast Guard may conduct searches and seizures and make arrests if during the course of a safety inspection circumstances arise that generate probable cause to believe that a violation of United States law has occurred. The *en banc* opinion's analysis begins with the assertion that the Coast Guard lawfully stopped and boarded the Stormy Seas to conduct a safety and documentary inspection. While on board the ship conflicting stories were given regarding the purpose of the trip, and it was observed that no ice was on board the ship and that the diving gear was inoperative. Based on these circumstances, Agent Wallace believed the Stormy Seas was on a narcotics run and this motivated him to ask about the amount of money on board the ship. Thomas Warren responded that he had approx-

Consequently, prior to this admission by Warren, there was no justification whatsoever for an expansion of the government's inquiry beyond whatever was needed to adequately conduct a safety and documentary inspection. The constitutionality of the seizure of the Stormy Seas depended upon the Coast Guard seizing the vessel for a limited purpose and restricting its activities on board to the accomplishment of that purpose.[7] Here, the government admits that part of its purpose in seizing the Stormy Seas was to permit government agents to uncover "obvious customs and narcotics violations." Once on board, DEA and Customs agents did nothing but seek out evidence of such violations. All of the evidence against the defendants was thus obtained during an unconstitutional seizure, and such evidence should have been suppressed at trial.[8]

There is another serious Fourth Amendment problem with the search and seizure of the Stormy Seas and that involves the active participation of Drug Enforcement Administration and Customs personnel in the whole episode. The panel opinion stated that the evidence derived from the search and seizure of the Stormy Seas should be suppressed because the Coast Guard had improperly delegated its authority to stop and search vessels under § 89(a) to members of other branches of the Federal Government who had no such authority.

imately $7,000 and that he had not registered it. It is at this point that the *en banc* opinion asserts that the government had probable cause to believe a crime had been committed, *see* Majority opinion pp. 1070–1071, and it was shortly after this point (after the agent actually saw the money) that the defendants and Cruse were arrested. Cruse subsequently confessed that the Stormy Seas was on a "pot run", and the vessel was seized and a further search uncovered evidence confirming Cruse's confession.

It cannot be seriously questioned that the confession of Cruse was a direct result of his arrest and the arrest of the defendants. Consequently, if the arrests of the defendants and Cruse were invalid, the confession of Cruse would likewise be invalid, and all evidence seized as a result of that confession would be inadmissible.

The *en banc* opinion reasons that probable cause to arrest the defendants for a currency violation existed after Thomas Warren admitted that he had not registered the money he had taken out of the country. I am not so sure that probable cause to arrest for a currency violation existed at this point, but I am certain that the *en banc* opinion was remiss in at least not discussing this determination in light of this Court's decisions in *United States v. Schneiderman*, 568 F.2d 1208 (5th Cir. 1978) and *United States v. Granda*, 565 F.2d 922 (5th Cir. 1978). These cases set forth the principle that a person cannot be prosecuted for failing to file a report when transporting more than $5,000 out of the country unless it can be shown that the person had knowledge of the reporting requirements and a specific intent to commit the violation. The cases go even farther in that they invalidate as a matter of law any convictions unless affirmative steps had been taken by the government to make the laws' requirements known. *See* Majority opinion p. 1075. The interesting point about these opinions in light

of this case is whether probable cause to arrest for these currency violations can exist without an initial determination of whether the defendant had knowledge of the reporting requirements. It is not against the law to take more than $5000 out of the country. Consequently, if a person's knowledge of the reporting requirement is an essential element of the offense, can probable cause exist when no evidence regarding this element is known by the law enforcement officer? I am not sure of the answer to this question, but I do believe it to be serious enough to warrant discussion by the *en banc* opinion.

7. Probable cause or consent are the only things which could justify the full scale search and inquiry which Agent Wallace conducted. No lesser degree of suspicion should justify a further inquiry in this case when the Supreme Court stated in *Brignoni-Ponce* that any further detention or search after a stop by a Border Patrol officer must be based upon either probable cause or consent. 422 U.S. 873, 881–82, 95 S.Ct. 2574.

8. It would be interesting to consider what the effect would be on the drug prevention operations of the Coast Guard if the *en banc* court had not adopted its present position. If the Coast Guard were limited to safety and documentary inspections, it would still have the authority to stop any American vessel anywhere in the world to conduct a safety inspection. We would be naive if we did not acknowledge that under the guise of a safety inspection the Coast Guard could stop a vessel and search practically every area of the boat. While it is true that a safety inspection would not allow the Coast Guard to open drawers, cupboards, etc., the inspection is certainly broad enough in scope to discover if the vessel happens to have a cargo of several tons of marijuana.

It is not disputed that all of the evidence derived from the search of the Stormy Seas was a product of the efforts of the DEA agent and the Customs officer. Shockingly, a majority of the *en banc* court feels it appropriate to "infer" a proper delegation of this authority.[9] This Court's willingness to infer such consent without even the least bit of a discussion as to the propriety of such an inference causes me great concern. The drug problem in this country is extremely serious. We need the most forceful prosecutions possible. However, we cannot ignore the basic rights which have allowed our way of life to continue some 200 years. We cannot and must not say "the end justifies the means" at the expense of our constitutional rights. Few of these rights are more treasured than those protected by the Fourth Amendment.[10]

The *en banc* opinion proposes as an alternative reason for allowing the participation of the DEA and Customs agents the fact that the defendants never raised this point either in the district court or the appellate court.[11] The *en banc* Court could not be more wrong! At the hearing to suppress the evidence seized from the Stormy Seas, counsel for John Warren argued extensively that no authority existed for the Customs and DEA agents to participate in this search and seizure. Record, Vol. 2, at 122–124. Counsel earlier raised this same point to the district court in his written memorandum of law in support of a motion to suppress.[12] Record, Vol. 1, at 44. Once the defendants raised this point, the burden fell on the government to justify the participation of the agents, and from the record before us, it is obvious that no such justification exists.[13]

**9.** The *en banc* opinion states, "Although the record does not expressly indicate whether consent was given, we think it a fair inference that at least implied consent was given." The consent the *en banc* opinion is referring to is that required by 14 U.S.C. § 141(b) which provides that the Coast Guard may "with the consent of the head of the agency concerned" avail itself of officers from other federal agencies. The statute requires the actual consent of the head of agency concerned—not the implied consent.

**10.** Mr. Justice Bradley's admonition in his opinion for the court almost a century ago in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1885), is worth repeating here:

It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Id.* at 635, 6 S.Ct. at 535.

**11.** The *en banc* opinion states:

Moreover, it is incumbent upon the party moving to suppress evidence to demonstrate a lack of authority for its acquisition. The defendants made no contention either in the

district court or on appeal, that consent was lacking.

**12.** It is possible to read the *en banc* opinion to mean that the defendants waived this error because it was not enough simply to contest the legality of the participation of these agents. Rather, the defendants erred by not also arguing that consent was never actually given from the heads of the relevant agencies. Surely, the *en banc* court is not holding that a defendant, when he challenges the constitutionality of a governmental activity, has the burden of demonstrating why every possible justification for this activity is inapplicable, and, if the defendant fails to bring up one of these justifications, then he has waived his constitutional attack. Counsel for the defendants challenged the participation of these agents in their written motion to suppress and orally. Nowhere in the government's responses to these challenges at the district court level is there any mention that 14 U.S.C. § 141(b) might justify their participation. It certainly was not the duty of the defendants to try to figure out how the Coast Guard could justify officers from other federal agencies being on board a Coast Guard cutter hundreds of miles from the United States.

**13.** The *en banc* opinion's final proposition in its struggle to justify the participation of these agents claims that even if the agents were not authorized to be on board the Coast Guard cutter, their actions did not invalidate the search and seizure of the Stormy Seas because they were carried out "under the aegis of the Coast Guard." For this proposition the court cites *United States v. Bates*, 526 F.2d 966 (5th Cir. 1976). In *Bates*, a defendant's automobile

## B. The Fifth Amendment Issues

The panel opinion held that the failure to give Thomas Warren his *Miranda* warnings prior to questioning him regarding the amount of money in his possession violated the Fifth Amendment. We explained in that opinion that:

Focus for *Miranda* purposes occurs when questioning is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of actions in any significant way. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). There is no question that all the defendants had been sufficiently deprived of their freedom such that *Miranda* warnings should have been given. The defendants had all been removed to the fantail of the ship, their guns, which were lawfully on board, had been seized as soon as the Coast Guard boarded the ship, all officers who boarded the ship were armed, and the Steadfast was nearby with three machine guns on its deck to insure that the Stormy Seas did not depart unexpectedly. *Miranda* warnings are required when one is effectively deprived of freedom of movement in any significant way and this is especially true when the questioning is designed specifically to yield incriminating statements. There is no doubt, therefore, that these defendants had been denied their freedom of movement to the degree necessary to trigger the giving of *Miranda* warnings.

The *en banc* opinion disagrees with the panel's earlier analysis about the extent to which the defendant's freedom of action had been restricted. The *en banc* opinion asserts that the factors which normally occur in Coast Guard safety and documentary inspections cannot be used as indicias of a custodial atmosphere. Rather, the opinion claims that since these factors constantly recur they are routine and thus expected by a crew member on a boarded vessel. Therefore, in order for a situation to arise that is sufficiently custodial to warrant the giving of *Miranda* warnings, it is necessary to look beyond these routine factors and determine whether anything occurred which distinguishes this stopping and questioning from other stoppings. The *en banc* opinion then analyzes the facts of this case under the four-factor test set forth initially in *United States v. Montos*, 421 F.2d 215 (5th Cir. 1970), and concludes that nothing occurred on board the Stormy Seas which would warrant an earlier giving of the *Miranda* warnings to the defendant.

The *en banc* opinion states:

Every American flag vessel on the high seas is subject to Coast Guard boarding and inspection. . . . Therefore, the coercive atmosphere that is the primal indicium of a custodial interrogation, . . . is generally absent because such boardings are routine.

*Id.* at 967.

It is difficult to see how the above factual setting is analogous in any way to our case. The facts of our case indicate that the DEA and Customs officers conducted their own search and interrogation of Stormy Seas and its crew. Their activities were totally distinct from the safety and documentary inspection being carried on by Lieutenant Miller of the Coast Guard boarding party. All evidence that was seized from the Stormy Seas was a direct result of the activities of the DEA and Customs officers. But for their efforts, no evidence whatsoever would have been discovered to justify the subsequent full scale search of the vessel. Thus, it is impossible to compare this situation with the situation in *Bates* wherein the efforts of the Customs inspectors played a significant if not critical role in the discovery of the evidence against the defendant.

---

was searched at the Mexican border by Customs inspectors. During the inspection a DEA agent assisted one of the Customs inspectors in the removal and opening of one of the tires from the auto. Removal of the tire was prompted by the fact that a Customs inspector has noticed that left rear tire was visually different from the other tires. Inside the tire was found a variety of controlled substances. The defendant argued that the evidence should be suppressed because the DEA agent was not specifically empowered by statute to conduct border searches. This Court refused to reach the question of the scope of the authority of the DEA because:

[T]he search was "conducted jointly by [DEA] Agent D'Antuono . . . and Customs Inspector Nowell . . ." and thus the search was under "the aegis of the Customs officer."

**1088**

One error in this analysis is that these boardings are routine only for the Coast Guard—not for the crew of the vessel being boarded. While it is true that every American vessel knows that it is subject to the possibility of such a boarding, in reality, a vessel may go for extended periods of time (or forever) without being boarded on the high seas. This factor distinguishes this situation from an interrogation at a border crossing since in the latter situation almost every person who crosses the border will be stopped and asked questions. On the high seas, however, there could be persons on board a ship that have never been involved in a stop before, and for these persons such a stopping is in no way routine.

I do not contend that all questioning which occurs aboard a vessel stopped for a safety and documentary inspection is always custodial in nature. Rather, I simply feel that certain factors are relevant to that determination even though these events may happen in most Coast Guard stoppings. For example, it seems most unrealistic to propose, as the majority does, that we not consider the facts that the boarding party was armed and that the Coast Guard cutter had machine guns on its deck in order to forcibly stop the Stormy Seas had it not voluntarily stopped. While these factors are generally present, so too are the presence of guns in a police station. Nonetheless, both are relevant to the creation of a custodial atmosphere. It is seldom routine for the one at the wrong end of the gun.

As pointed out by the *en banc* opinion, this Court has adopted a four-factor test to aid in the determination of whether an interrogation is sufficiently custodial in nature to warrant the giving of *Miranda* warnings. No single factor in this test is necessarily decisive, *United States v. Montos*, 421 F.2d 215, 222 (5th Cir. 1970), and a proper analysis involves the consideration of all the factors. The first factor for consideration—whether probable cause to arrest the defendant had arisen at the time of the interrogation—is the only factor in the test which implicates a lack of a custodial situation. Both the government and the defendant admit that prior to the inter-

rogation about money no probable cause to arrest had arisen. The remaining factors, however, are all supportive of the giving of *Miranda* warnings, and the *en banc* opinion's treatment of those factors is seriously flawed.

The second factor we are to consider is whether the subjective intent of the officer conducting the interrogation was to hold the defendant. The *en banc* opinion admits that the intent of the boarding party was to restrict the freedom of the Stormy Seas, but the opinion goes on to say that this is not enough since the freedom of every vessel boarded by the Coast Guard is restricted, and for this factor to have any meaning "the officer must intend to go beyond the customary and routine boarding and search." The opinion then concludes that the subjective intent of the officer was not to hold the defendant since "the record does not reflect that he intended to take Thomas Warren into custody at that point."

This approach creates several serious problems. The first is the opinion's refusal to consider the fact that the Stormy Seas was forcibly stopped. The fact that such stoppings are routine for the Coast Guard does not make the result of such a stopping any less intimidating for the crew of the seized vessel. However, even accepting the logic behind requiring more than what is routine in a Coast Guard stopping on the high seas, the test is met by the facts of the case before us. The *en banc* opinion states that "the officer must intend to go beyond the customary and routine boarding and search." It cannot be seriously disputed that the Customs and DEA agents here were not in any way involved with conducting the safety and documentary inspection on board the Stormy Seas. These agents boarded the Stormy Seas to look for customs and drug violations, and it is admitted by Agent Wallace that he made the inquiries regarding money because he suspected the purpose of the trip was to procure narcotics. Agent Wallace was in no way concerned with a safety violation when he was questioning Thomas Warren, and this factor coupled with the serious restriction of the

defendant's freedom of movement more than satisfies this element of our inquiry. Of interest is the fact the *en banc* opinion concludes that the subjective intent of the officer was not to hold the defendant because "the record does not reflect that he intended to take Thomas Warren into custody at that point." The opinion cites no authority for the proposition that this factor in our test is satisfied only if there is an intent on the officer's part to presently take the defendant into custody. The reason that this proposition is without a supporting citation is probably because it is not the relevant inquiry to be made. In order for an officer to have the present intent to take a subject into custody he must have probable cause to arrest. Our initial inquiry in our four-factor test was whether probable cause to arrest existed. It makes no sense to even examine the second factor if in order to satisfy it you must have met the first factor, and this is especially so in this sort of a situation where if probable cause to arrest exists, then it naturally follows that the officer intends to take the subject into custody. Obviously, this factor can be satisfied by something less than an officer's intent to actually take a subject into custody, and I think the factual situation before us satisfies this factor.

Our third inquiry requires an examination of whether the subjective belief of the defendant was that his freedom of movement was significantly restricted. The *en banc* opinion states that "to the extent that the boarding and inspection are routine, the defendants should not feel coerced," and that the relevant inquiry is "whether Thomas Warren believed that at the time of the questioning, the boarding and interrogation had gone so far beyond the customary that he was imminently subject to arrest." The opinion then concludes that the defendant did not believe his freedom to be significantly restricted at the time of the questioning because his responses to questions were intended to corroborate his earlier explanation for the purpose of his trip and thus he still believed the enterprise to be viable at the time of the questioning.

The majority's crystal ball is better than mine and I can only assume they have never been aboard a vessel stopped by the Coast Guard for any purpose. It is incredible to me that this Court can take the position that any reasonable person would not subjectively believe that his freedom of movement had been restricted when he is on board a vessel which is stopped on the high seas by the Coast Guard. Added to this is the fact that in our case Thomas Warren was being questioned by people who had nothing to do with the actual safety and documentary inspection. As a result, whatever might have been routine about the stop of the Stormy Seas lost this characteristic when the vessel was subjected to an extensive search of areas where safety violations obviously could not be found. It is also baffling to me that the *en banc* opinion can conclude that the defendant did not believe his freedom of movement to be restricted because he was still using his cover-up story. The relevance of this to the subjective belief of the defendant regarding his freedom is beyond me. I do understand, however, that the *en banc* opinion considers this somehow relevant to a determination of whether the defendant considered himself "imminently subject to arrest." As pointed out earlier, the test this Court has previously adopted is whether the defendant subjectively believed that his freedom of movement had been significantly restricted and not whether the defendant feels that he is imminently subject to arrest. These two tests are completely different, and if the *en banc* Court proposes to change the relevant test, then it should acknowledge exactly what its intentions are.

The final factor we are to consider in determining whether Thomas Warren was entitled to *Miranda* warnings is whether the investigation had focused on the defendant at the time of the interrogation. I think the answer to this is supplied by Agent Wallace's admission that his questions regarding money were prompted by his belief that the purpose of the trip was to bring back narcotics. Record, Vol. 2, at 77. At the time of the questioning, Agent

Wallace certainly believed that the defendant was involved in illegal operations, and his questioning was designed to elicit information substantiating this belief. The *en banc* opinion, however, states that it is only when an investigation shifts to the accusatory stage that it is sufficiently focused under this criterion, and that where officers are merely trying to ascertain if a federal crime has been committed, the accusatory stage has not yet begun. In support of this proposition, the opinion cites a 1966 Eight Circuit case. Unfortunately, the *en banc* opinion fails to provide us with any insight on exactly when an investigation becomes accusatory, but evidently the majority feels that this line has not been crossed when governmental officers admit that they believe certain people to have committed certain crimes and that their questioning is initiated solely to uncover more substantial evidence of those crimes. I cannot agree with this conclusion. We are not faced with a situation where a governmental officer is conducting general questioning to a wide variety of people. Rather, Agent Wallace admitted that he believed Thomas Warren to be on a drug run, and that his questions regarding money were designed to elicit evidence supporting this belief. If this sort of investigation is not "focused" upon a defendant, then I simply do not understand exactly what makes a confrontation between a governmental officer and a suspect "accusatory." It appears that the majority feels that the answer to this question turns on the quantum and quality of the evidence within the government's knowledge. But does that mean that an investigation by an officer who is not armed with probable cause (or something close to probable cause) cannot have focused on a defendant? Apparently, this is the majority's position, and the trouble with this analysis is that it makes our finding on the first factor (the probable cause inquiry) critical to our determination of the focus factor. Once again the majority has engaged in double counting. Obviously, this fourth factor must mean something different than the first factor, and a case cited by the majority opinion supports this position that it is possible for an investigation to have focused on a defendant even though probable cause to arrest does not exist. In *United States v. Carollo*, 507 F.2d 50 (5th Cir. 1975), this Court examined a factual situation in which it decided that only the fourth factor might be present. The Court concluded that a defendant could not be "in custody" for *Miranda* purposes if "the focus factor alone is present." *Id.* at 53. The *Carollo* opinion, however, acknowledges that the "focus" factor could be present even though probable cause does not exist. This is hardly possible under the majority's analysis since that analysis implies that the focus of an interrogation is on a defendant only when the interrogation becomes accusatory, and this apparently happens only if the officer conducting the investigation has probable cause (or something close to probable cause) to believe that the suspect has been involved in criminal activity. Such an improper approach for determining whether an investigation has focused on a defendant is not only unsupported by the authorities cited, but would also significantly reduce the number of situations in which the police would be required to give *Miranda* warnings. The analysis of the *en banc* opinion makes the determination regarding probable cause critical to the outcome of the inquiries in three of the four factors to be considered. Consequently, since no one factor can be decisive, once a court determines that probable cause does not exist, it has for all intents and purposes made a determination that *Miranda* warnings need not be given. I do not believe that such is the law of this Circuit, nor do I think such a position is constitutional. The Supreme Court said in *Beckwith v. United States*, 425 U.S. 341 (1976), that focus for *Miranda* purposes occurs when questioning is initiated by law enforcement officers after a person has been deprived of his freedom of actions in any significant way. The result of the analysis in the *en banc* opinion is to say that a person cannot be deprived of his freedom of actions unless a law enforcement officer has probable cause to believe a crime has been committed. This result is illogical and untenable.

This case presents still another Fifth Amendment problem. This relates to the testimony of Agent Battell at trial regarding Thomas Warren's statement to his brother and Cruse to remain silent. The issue is whether the reception of the testimony constituted an impermissible comment on the Warrens' right to remain silent. The *en banc* opinion holds that reception of this testimony was permissible under the Fifth Amendment in that the testimony "did not constitute a comment on the *exercise* of the Warrens' right to remain silent." The *en banc* opinion argues that all that the testimony indicated was that Thomas Warren advised his brother and Cruse not to say anything. Consequently:

> The jury could not have known whether the advice was in fact heeded. The testimony does not imply that Thomas Warren himself chose to exercise his right; he merely admonished the others not to speak.

Majority opinion p. 1073.

It is interesting to consider the potential effects of the *en banc* opinion's position on this point. If comment on the actual *exercise* of one's right to remain silent is all that is prohibited by the Fifth Amendment, is this Court then saying that everytime a law enforcement officer hears an attorney advise his client to remain silent it is permissible for that officer to testify to this at trial? Or, is the court saying that every time a defendant requests an attorney, it is permissible to enter testimony at trial regarding that request? The advice of an attorney to remain silent certainly ought to be protected even though testimony limited in scope just to this point in no way reflects whether the advice was actually heeded, and, therefore, in no way comments on the actual exercise of the right to remain silent. No one can doubt, however, that the introduction of such testimony is highly prejudicial, and no one should seriously contend that it was not prejudicial in this case to introduce testimony to the effect that one codefendant (Thomas Warren) had advised another codefendant (John Warren) to remain silent. Such testimony is just as inculpatory as a comment on a defendant's

right to remain silent, and one might consider exactly what value the privilege to remain silent and the right to an attorney have if we are going to allow a jury to draw negative inferences from the advice that an attorney might give to a defendant regarding his right to remain silent. Accordingly, I believe the Fifth Amendment encompasses more than just the actual exercise of the privilege to remain silent, and is broad enough to preclude comment on an attorney's advice to his client to remain silent. Of some interest is whether Thomas Warren—who is an attorney—could be said to have been acting in that capacity when he made the statement to his brother and Cruse. This is a point with which the *en banc* opinion does not deal—preferring instead to rely on broad language permitting any type of comment except a comment on the actual exercise of the right to remain silent. My dissent as to this point is predicated more on the broad sweep of the language of the *en banc* opinion rather than the actual result in this case. It seems unfortunate that the *en banc* opinion did not restrict the breadth of its language, and deal instead with the unique facts of this case. Possibly, the same result might have been reached without having to further restrict the rights of American citizens.

### C. Conclusion

Nothing contained in this dissent is intended to be critical of the Coast Guard, Drug Enforcement Agency or the Customs officials. These government agents are involved in a "war against drugs." The seriousness of this problem and the full consequences of their action can not be questioned. Their candor has assisted all in focusing upon the real issues involved. But history has proved over and over that if we are to retain the basic freedoms that make us unique, we must never lose sight of the importance of preserving our basic constitutional rights. Today's action greatly undermines the Fourth and Fifth Amendments. Our Court has tragically diluted the rights of American citizens when they sail beyond the twelve mile point onto the high seas. I

regret such a holding and reluctantly dissent.